# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**LUBLEEJOY GRANT**,

               Plaintiff,

         v.

HER IMPORTS NY, LLC, HER IMPORTS LLC,
HER HOLDING, INC., and EZJR, INC.

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 1:15-cv-5100
(DLI)

ECF CASE

**ORAL ARGUMENT
REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF MOTION BY DEFENDANTS
## HER HOLDING, INC., AND EZJR, INC. FOR SUMMARY JUDGMENT

James J. DeCristofaro, Esq.
DCL Firm (DeCristofaro Law)
260 W 26th Street, Suite 7Q
New York, New York 10001
Tel.  (212) 500-1891
Fax  (917) 591-0289
Email:  james@dclfirm.com

*Attorneys for Defendants HER Holding, Inc.
and EZJR, Inc.*

Date of Service:  August 12, 2016

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

ARGUMENT ...................................................................................................................... 12

    POINT I: ........................................................................................................................ 12

    THE COURT SHOULD DISMISS THIS ACTION AS AGAINST HER HOLDING
    BECAUSE HER HOLDING DID NOT EMPLOY GRANT AND CANNOT BE HELD
    LIABLE AS A SINGLE INTEGRATED ENTERPRISE WITH HER IMPORTS ................. 12

    POINT II: ....................................................................................................................... 13

    THE COURT SHOULD DISMISS EZJR FROM THIS ACTION BECAUSE EZJR DID NOT
    EMPLOY GRANT AND CANNOT BE HELD LIABLE BASED ON THE AGREEMENT
    WITH HER IMPORTS ..................................................................................................... 13

        A.   EZJR Is Not a Joint Employer of Grant ....................................................... 13

        B.   Grant Cannot Establish that EZJR Is Liable to Grant on the Basis That EZJR Is A
        Single Integrated Enterprise With HER Imports ................................................. 21

CONCLUSION .................................................................................................................... 25

## Table of Authorities

### Cases

Bricklayers & Allied Craftworkers Local 2, Albany v. C.G. Yantch, Inc., 316 F. Supp. 2d 130, 143 (N.D.N.Y. 2003) ................................................................................................. 13, 23

Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984) ..................................................... 14

Charles v. Cty. of Nassau, 116 F. Supp. 3d 107, 116-17 (E.D.N.Y. 2015) ................................. 12

Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901 (S.D.N.Y. 2013).............................. 14, 23

Herman v. Blockbuster Entm't Grp., 18 F. Supp. 2d 304 (S.D.N.Y. 1998) ........................... 23, 24

Hugee v. SJC Group, Inc., 13 Civ. 0423 (GBD), 2013 WL 4399226, *15-17 (S.D.N.Y. 2013) ............................................................................................................................... passim

Jean-Louis v. Metro. Cable Commc'ns., Inc., 838 F. Supp. 2d 111, 136-37 (S.D.N.Y. 2011)... 17, 18, 19, 20

Jiao v. Chen, 03 Civ. 0165 (DF), 2007 WL 4944767, *31 (S.D.N.Y. Mar. 30, 2007).......... 12, 25

Khereed v. W. 12th St. Rest. Grp., LLC, 15-cv-1363 (PKC), 2016 WL 590233, *13 (S.D.N.Y. Feb. 11, 2016) ................................................................................................................... 22, 24

Lopez v. Acme Am. Envtl. Co., 12 Civ. 511 (WHP), 2012 WL 6062501, *10-11 (S.D.N.Y. Dec. 6, 2012) .............................................................................................................................. 25, 26

Reiseck v. Univ. Commc'ns, No. 06 Civ. 0777 (TPG), 2012 WL 3642375 at *16-17 (S.D.N.Y. Aug. 23, 2012) ...................................................................................................................... 16

Zheng v. Liberty Apparel Co., 355 F.3d 61, 72 (2d. Cir. 2003) ................................................... 14

### Rules

Fed. R. Civ. P. 56 .......................................................................................................................... 3

Defendant HER Holding, Inc. ("HER Holding") and Defendant EZJR, Inc. ("EZJR," and collectively with HER Holding, the "Moving Defendants"), by their undersigned attorneys, hereby submit this Memorandum of Law in support of the motion by the Moving Defendants for summary judgment dismissing the claims asserted against them by Plaintiff Lubleejoy Grant ("Grant"), and respectfully state as follows:

## PRELIMINARY STATEMENT

The Court should grant the motion by the Moving Defendants for summary judgment because there are no genuine issues of material fact; indeed, the undisputed facts show, as a matter of law, that the Moving Defendants were never a joint employer, nor part of a single integrated enterprise.

First, HER Holding cannot be considered a joint employer or part of a single integrated enterprise because it was not formed until March 6, 2015 (Articles of Incorporation, the Corporate Charter, and the Initial/Annual List of Officers for HER Holding, attached to the Declaration of David Cronister (the "Cronister Decl.") as Ex. L), which was *after* Grant stopped providing services to HER Imports LLC ("HER Imports") as an independent contractor, or, at the very least, in the same month that she claims to have stopped providing services to HER Imports:  "As a result of the non-payment of wages, *Ms. Grant resigned from her position of employment with Defendants in March 2015*."  (Compl., ¶ 36, attached to the Declaration of James J. DeCristofaro  (the "DeCristofaro Decl.") as Ex. I, ECF Docket No. 1.)  How can Grant seriously claim that she was "*hired by Defendants in early July 2013*" (Ex. I, ¶ 23; emphasis added),[1] or that she "worked between sixty (60) and sixty-eight (68) hours per week throughout the *entirety of her employment with Defendants*,"  (Ex. I, ¶ 32; emphasis added), which includes HER Holding, when defendant HER Holding was not even formed until March 2015?  She

---

[1]      The Complaint's definition of "Defendants" includes HER Holding.  (Ex I, at 1.)

cannot.  Regardless, there is no genuine issue of material fact in dispute as to when HER Holding was formed, nor as to the dates when Grant performed services as an independent contractor to HER Imports, and because the date that HER Holding was formed is outside that period, the Court should grant summary judgment in favor of HER Holding and dismiss all claims against HER Holding.

Second, EZJR cannot be considered a joint employer of Grant because it is not in material factual dispute that:

- Barry Hall ("Hall") was designated as EZJR's witness under Rule 30(b)(6) of the Federal Rules of Civil Procedure (Hall Dep. Tr., attached to the declaration of Hall (the "Hall Decl.") as Ex. B, 1:16);

- EZJR never set Grant's compensation (Ex. B, 62:23-25);

- EZJR never tasked Grant with any responsibilities (Ex. B, 63:1-3);

- Despite Grant claiming in her Complaint that "[f]rom October 2014 through March 2015, Barry Hall . . . controlled Plaintiff's terms and conditions of employment, including but not limited to compensation" (Ex. I, ¶ 12), Grant admitted during deposition that:

  o Grant only had one conversation with Hall, ever, after claiming first that she had never met him (Grant Dep. Tr., attached to the DeCristofaro Decl. as Ex. J, 68:14-69:6);

  o Grant never had any phone calls with Hall, ever (id., 68:14-69:14);

  o Grant never received a voicemail from Hall, ever (id., 69:7-14);

  o Grant only received one email message from Hall, and that email was limited to Hall asking Grant for copies of real property leases for Brooklyn and New Jersey (id., 69:7-70:6); and

- Grant admits that she never visited EZJR in Las Vegas, Nevada (Ex. J, 68:3-10), where EZJR's principal executive offices are located (Form 10-K for period ending 12/31/14, attached to Hall Decl. as Ex. C, at cover page 2).

In light of the foregoing, and as discussed in more detail below, given that there is no genuine issue of material fact as to the lack of any contact between EZJR and Grant, and given that, as a

2

matter of law, the material, undisputed facts show that EZJR is not a joint employer under any realistic interpretation of the standards applicable here, the Court should grant summary judgment in favor of EZJR, find that EZJR has no liability to Grant in this case, and dismiss EZJR from this case in all respects.

Third, the Court should also grant summary judgment in favor of EZJR because, even if, assuming arguendo that the single integrated enterprise test applies here, EZJR is not part of a single integrated enterprise with HER Imports because:

- EZJR is a stand-alone, public company (Ex. B, 11:8-9), and EZJR and HER Imports are "two separate companies.  We certainly coordinate activities like you would with any business partner, but I have no say in any decisions they may make, and they have no decisions – no say in any decision regarding EZJR" (Ex. B, 32:12-21);

- EZJR and HER Imports do not have common ownership (Ex. B, at 62:13-18; Cronister Dep. Tr., attached to the Cronister Decl. as Ex. K, at 36:12-15);

- When EZJR files financial statements with the SEC, the statements are consolidated financial statements *of EZJR* (Ex. B, at 61:14-15), and do not include financial statements for HER Imports NY, LLC ("HER Imports NY") (id., 61:16-18), nor for HER Imports (id., 61:19-20), nor for HER Holding (id., 61:21-22); and

- Hiring, firing, and compensation decisions are made by David Cronister ("Cronister"), who is employed by HER Imports, not EZJR, and EZJR does not have control over labor relations (Ex. K, 14:10-16:6).

The foregoing material facts as they relate to the single integrated enterprise test are material, and are not in dispute.  Because they show that as a matter of law, EZJR is not part of a single integrated enterprise with HER Imports, the Court should similarly grant summary judgment in favor of EZJR, find that EZJR has no liability to Grant in this case.

## STATEMENT OF FACTS

HER Imports is a domestic limited liability company, duly organized and existing in the State of Maryland.  (Ex. I, ¶ 7.)  HER Imports is engaged in the business of selling human hair

extensions and related hair care products under the HER Imports brand name.  (Id., ¶ 14.)  HER Holding is a corporation organized under the laws of the State of Nevada.  (Id., ¶ 8.)  EZJR is a foreign corporation, duly organized under the laws of the State of Nevada, with its principal place of business located in Las Vegas, Nevada. (Id., ¶ 9.)  At all relevant times, Patrick Terry was involved in the operations of HER Imports NY, LLC ("HER Imports NY") and HER Imports.  (Id., ¶ 10.)  HER Imports NY is a domestic limited liability company, organized and existing in the State of NY, with its principal place of business located at 851 Quincy Street, Brooklyn, NY, which is also the location of the Brooklyn store.  (Id., ¶ 6.)

At all relevant times, Jerome Reid was the Managing Member of HER Imports NY and HER Imports.  (Ex. I, ¶ 11.)  Cronister works for HER Imports; he managed the operations of HER Imports in Las Vegas until he became national manager at around the same time that HER Imports and EZJR executed the Marketing and Selling Agreement dated October 1, 2014 (the "Agreement," attached to the Hall Decl. as Ex. A).  (Ex. K, 12:5-23.)

HER Imports hired Grant to work at its Brooklyn store location.  (Ex. I, ¶ 23.)  Grant's responsibilities consisted of setting up and running the Brooklyn and Newark store locations, and going to clubs and bars to promote HER Imports products.  (Ex. J, at 16:3-6, 18:18-20:11.)

On October 1, 2014, HER Imports and EZJR entered into the Agreement. (Ex. A, at 9.)  At all relevant times, Hall was an officer in EZJR.  (Ex. A, ¶ 12.)  EZJR and HER Imports do not have common ownership.  (Ex B, 62:13-18; Ex. J, 36:12-15.)

EZJR is in the business of improving the sales performance of brands, products and services by way of its proprietary eCommerce platform. (Ex. A, at 1.)  Providing online sales tools such as the eCommerce platform to existing brands is the heart of EZJR's business:

> [Y]ou'll also hear it referred to as a CRM, which is a customer relations
> manager.  It's software that we use to manage online sales and to market

4

> to our customers in various ways; test the results of that marketing; see
> how it all works.  That's really our business.

(Ex. B, 30:25-31:5.)

EZJR's Form 10-K for the period ending December 31, 2014 describes EZJR's business

in even more detail:

> EZJR's primary business is to improve the sales performance of brands, products
> and services by way of its proprietary eCommerce platform. Our unique
> methodology minimizes the cost of generating leads and then maximizes the
> conversion of those leads into customers. After the initial sale, EZJR utilizes a
> process for monetizing customers to the greatest extent possible through up-sales,
> down-sales and cross-sales. As of October 1, 2014 EZJR, entered into a
> Marketing and Selling Agreement (the "Agreement") with Her Imports, LLC
> ("Her"), a retailer of human hair extensions and related products. Under the
> agreement EZJR was to custom design Her's eCommerce Websites and generate
> customer leads through email marketing campaigns, online advertising and social
> media and various affiliate marketing campaigns.  Finally, EZJR was to sell Her's
> products as well as other products to these customers. As part of the Agreement
> EZJR purchased Her's inventory that was on hand at September 30, 2014 in
> exchange for a Secured Promissory Note. It is the Company's intention to enter
> into similar agreements with other brands and retailers some of whom will pay a
> commission to the Company based on the sales generated.

(Ex. C., at 6.)

The Agreement established an arm's length relationship between the parties, who were

working together as independent contractors. (Ex. A, ¶ 1.1.)  Paragraph 2 of the Agreement

details the responsibilities of EZJR under the Agreement, which include purchasing inventory

(Ex. A, ¶ 2.1), marketing – online marketing, branding, press releases, events, celebrity

endorsements, tradeshows, and traditional advertising  (Ex. A, ¶ 2.2), sales process management

(Ex. A, ¶ 2.3), and other administrative functions (Ex. A, ¶ 2.4).

Hall's testimony, which is uncontroverted, also confirms that the relationships established

by the Agreement and its amendments are arm's-length transactions:

> Q.   … Marketing and Selling Agreement and the Amendments, does that
> reflect an arm's length transaction?   A.   Yes, would it would be an
> ongoing transaction.

Q.  Arm's length transaction.  A.  Yes.

Q.    Why is it an arm's length transaction?  A.    Because it's an independent agreement entered into, two separate parties, and it's a contract.  And at the time we entered into it, the two separate parties had no co-ownership, no involvement with each other, nothing like that.

(Ex. B, 62:7-18.)

Paragraph 3 of the Agreement details the responsibilities of HER Imports, which include providing and maintaining sales facilities (Ex. A, ¶ 3.1), customer service (Ex. A, ¶ 3.2), promotion – store promotion and field promotion (Ex. A, ¶ 3.3), developing and sourcing products (Ex. A, ¶ 3.4), and generating reports about inventory, source of customers, and customer satisfaction surveys (Ex. A, ¶ 3.5).

Paragraph 4 of the Agreement details:  (a) payments from EZJR to HER Imports, which include payments for physical facilities (Ex. A, ¶ 4.1), and royalty payments net of deductions for taxes, freight, custom duties, and so on (Ex. A, ¶ 4.2); and (b) reporting (Ex. A, ¶ 4.3), late payment (Ex. A, ¶ 4.4), and obligations to maintain certain records (Ex. A, ¶ 4.5).

Paragraph 5 of the Agreement provides that:

EZJR will purchase from Her all inventory on hand as of October 1, 2014. Payment for this inventory purchase shall be in the form of the Secured Promissory Note attached to this Agreement as Exhibit A.  Her will provided [sic] to EZJR a detailed inventory report delineating all inventory on hand by product class and location.

(Ex. A, ¶ 5.)

On November 14, 2014, HER Imports and EZJR amended the Agreement ("Amendment #1," attached to the Hall Decl. as Ex. D).  Section 1 of Amendment #1 provides that EZJR may offset payments due to HER Imports.  (Ex. D.)   The Agreement was amended a second time on August 28, 2015 ("Amendment #2"), and a third time on October 13, 2015 ("Amendment #3"). Amendment #2 is attached to the Hall Decl. as Ex. E; Amendment #3 is attached as Ex. F.

Hall testified that EZJR is a publicly traded company that is required to file regular financial statements with the Securities and Exchange Commission ("SEC").  (Ex. B, 60:24-61:7.)  When asked if EZJR's SEC filings included information related to the HER entities, he answered as follows:

> Q.   For what company are the financial statements for, whose books?  A. They're the consolidated financial statements of EZJR, Inc.
>
> Q.   Do they include financial statements of Her Imports New York, LLC? A.  No.
>
> Q.  How about for Her Imports, LLC?  A.   No.
>
> Q.  How about for Her Holding, Inc.?  A.   No.
>
> Q.   Why not?  A.   Because they are not part of our consolidated entity, and to do so would be improper.
>
> Q.  Why would it be improper?  A.   To recognize expenses or revenues for – and plus they aren't audited.  Ours are audited financial statements for this entity.

(Ex. B, 61:12-62:4.)

Grant claims that she resigned from HER Imports in March 2015.  (Ex. I, ¶ 36.)  HER Holding was incorporated on March 6, 2015. (Ex. L.)   The Articles of Incorporation list Cronister as the President of HER Holding.  (Id.)  On or about March 7, 2015, HER Holding and HER Imports entered into an Assignment and Assumption Agreement where HER Imports transferred all of the obligations and all of the rights of HER Imports under the Agreement to HER Holding (the "Assignment," attached to the Hall Decl. as Ex. G.).

In his deposition, Cronister stated that he decides how much employees of HER Imports will be paid and communicates that to Jodi Girante, an employee of EZJR, to effectuate changes to compensation.  (Ex. K, 14:10-16:6.)  He stated that he mentions changes in compensation to

Hall casually but that Hall has no control over how much HER Imports pays its employees.  (Ex.

K, 15:20-16:4.).

Hall testified about payroll functions EZJR performed for HER Imports as follows:

Q.   What payroll functions do you perform for Her Imports?   A.   I personally don't perform any payroll functions.   EZJR, my assistant, who is not here today, she will go through and enter the hours into the payroll system for the employees and certain – there's still a couple independent contractors to be paid.

Q.  What percent of the EZJR/Her relationship would that account for?  A. I don't understand what you mean.

Q.  Is that EZJR's main purpose with Her?  A.  Absolutely not.  That's a minor favor, if you will.  That takes no more than two hours every two weeks.

(Ex. B, 43:19-44:6.)

On January 23, 2015, Grant sent an email to Hall and copied Cronister:

Good Evening,

This is Joy, I'm currently an employee of Her Imports, operating from New York and Newark. I have called you (As Per Dave) and left a message. I spoke with Dave and he has informed me that you are aware of the pay situation, he also advised me to send this email to you, regarding payroll. My address for check payment is as followed (sic) . . .

(January 23, 2015 mail from Grant to Hall, attached to Hall Decl. as Ex. H.)

In his deposition, Hall explained that among the offsets EZJR claimed against the

royalties owed to HER Imports was a payment made to Erica Hicks ("Hicks"):

Q.   Do you know why EZJR sent $5,000 to Erica Hicks? A. I was requested by Her Imports to do so.

Q. Okay.  And the reason you – and – okay.  And on here it says – who wrote the first – the paragraph on this?

MR. DECRISTOFARO: Objection.

THE WITNESS:   I wrote this entire thing.

8

> BY MR. BLIT Q.  Okay. You wrote this entire thing.  Why did you write this entire thing?  A.  This was an explanation of a payment that was made to Erica Hicks, and I was told later that when I asked Dave or Jerome or Patrick or somebody, I don't recall who, why wasn't she paid, they go, "We paid her 5,000, don't you remember?"  I said, "Okay."  And I went back and looked and found this payment.  At the time, I did not know it was for Joy Grant.
>
> Q.  Okay. And on here you wrote "Amount was booked against royalties in our financial statements."  A.  Yes.
>
> Q.  What do you mean by that? A.  Well, as you recall, Amendment Number 1 to the Selling and Marketing Agreement allowed for us to make payments on behalf of Her Imports and to offset those payments against any royalties that we may owe.  So that's the way I treated this.  There are – unless I have an invoice that specifically applies to EZJR, I make a payment at the request of somebody for Her Imports or Her Holding or any – if I don't have an invoice showing that this benefited EZJR, then it goes against the royalty agreement.  That royalty payment, sorry.
>
> Q.  So even though it went against the royalty payment, wasn't it a benefit of EZJR? A I don't know. I wouldn't say no.
>
> Q.  That's because it was a responsibility of EZJR to reimburse Her for any employee or sales rep expenses, correct?  A.  Yes.

(Ex. B, 49:16-51:5.)[2]  Otherwise, Hall confirmed that EZJR never directly paid Grant or wired money to Grant.  (Ex. B, 48:13-16.)

Grant confirmed that she asked HER Imports to transfer the money she was owed in compensation to Hicks:

> Q.  Did you ever request that HER Imports transfer funds to the account of Ms. Hicks?  A.  Yes, I did. He owed me at that time $15,000. I was complaining it to Patrick and I told Patrick, "Listen, I'm going to New Jersey.  I haven't been paid since Georgette left.  At that time it's been over six months and I haven't been paid and I'm using all the money that I have saved and I don't have any money.  I'm running low."  And he said, "Well, give me an account that I could transfer the money to, a Bank of America account."  I didn't have Bank of America, but my niece did.  So I told him I was going to call him back, and I contacted my niece, she provided me with the bank account information, the BOA, and he transferred the money into there.

---

[2]     The Moving Defendants withdraw their objection in this quoted text from Hall's deposition.

(Ex. J, 73:15-74:7.)

Hall testified that neither he nor anyone else at EZJR ever controlled or directed the terms

of Grant's work at HER Imports:

> Q.  Okay. Changing topics again, did you, or anyone else at EZJR, at any time control or direct the terms of Ms. Grant's work at Her Imports?  A. No.  I've never met or spoken to Ms. Grant.
>
> Q.  Did you, or any one else at EZJR, set Ms. Grant's compensation?  A. No.
>
> Q.  Did you, or anyone else at EZJR, ever task Ms. Grant with any responsibilities? A.  No.

(Ex. B, 62:19-63:3.)

During her deposition, Grant admitted that her interactions with Hall were extremely

limited:

> Q.  Barry Hall, did you ever meet him in person? A.  No.
>
> Q.  Do you know who he is?  A.  I know who he is, but I never met Barry.
>
> Q.  Did you ever communicate with him?  A.  I called him several times as per David, but he didn't really return back. I may have – I don't want to give any false information.  I believe I had a conversation with him one time, I'm not too sure, but maybe it was what David communicated back to me – no, I did.  I'm sorry.  Him and David was at dinner and we had a conversation about payment.
>
> Q.  One conversation? A.  Yes.
>
> Q.  Any other communications with Barry Hall?  A.  E-mails and voice messages.
>
> Q.  Voice messages to him or from him?  A.  To him.
>
> Q.  Did you ever receive voice messages from him?  A.  No, I don't believe so.
>
> Q.  E-mails. Are these e-mails to him or from him?  A.  To him.
>
> Q.  Did you ever receive any e-mails from him?  A.  I believe so. I believe I did request the lease for – he wanted the lease for the storefront in Brooklyn – wait. Did I have the one for Jersey? I believe Jersey too, when

10

we moved out of the location in Newark on Broad Street, when we moved out of that location into the new location he wanted – I think it was the lease for Brooklyn and the new location.

Q.  Any other e-mails from him, as you can recall?  A.   No.

(Ex. J, 68:14-70:6.)

There is no evidence in the record that Hall ever visited the Brooklyn or Newark locations.  In fact, Hall testified during his deposition that he rarely visited the HER Imports locations:

Q.  Do you ever visit any of the locations?  A.  Yes.

Q.  Which locations – why do you visit locations?

MR. DeCRISTOFARO:  Objection.

THE WITNESS:  I have given our auditors tours of them during the inventory counts, and that's primarily it.

(Ex. B, 31:7-13.)[3]

The evidence shows that HER Imports operated independently from EZJR:

Q.   Does Her operate independently from EZJR?  A.  Which Her?

Q.  Her, LLC.  A.  Obviously, yes, very independently.

Q.  How so?  A.  It's two separate companies.  We certainly coordinate activities like you would with any business partner, but I have no say in any decisions that they may make, and they have no decisions – no say in any decision regarding EZJR.

(Ex. B, 32:12-21.)  Hall further testified:

Q.  Are they allowed to do so without EZJR approval?  A.  They can do whatever they like without EZJR's approval.  But when it comes to the product that we sell, we're only going to sell the products that we approve of.

Q.  What do you mean by that? Do they sell separately than EZJR?  A.  Her what?

---

[3]       The Moving Defendants withdraw their objection in this quoted text from Hall's deposition.

> Q.  Do they sell anything –  A.  Not in these retail locations, they don't. Not through us.  But as far as them selling other products, they could be selling, you know, wheat and oil for all I know.  I have no idea.

(Ex. B, 33:14-25.)

## ARGUMENT

Pursuant to Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In Charles v. Cty. of Nassau, the Eastern District explained that when evaluating a motion for summary judgment:

> the role of the court is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. A genuine issue of fact exists when there is sufficient evidence on which the jury could reasonably find for the plaintiff. The mere existence of a scintilla of evidence is not sufficient to defeat summary judgment. The court's function is to decide whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party.

116 F. Supp. 3d 107, 116-17 (E.D.N.Y. 2015).

Here, the Court should dismiss the Moving Defendants from this action because, even after resolving all ambiguities and drawing all inferences in favor of Grant, there are no facts that would warrant a finding that either EZJR or HER Holding is liable to Grant.

## POINT I:
## THE COURT SHOULD DISMISS THIS ACTION AS AGAINST HER HOLDING BECAUSE HER HOLDING DID NOT EMPLOY GRANT AND CANNOT BE HELD LIABLE AS A SINGLE INTEGRATED ENTERPRISE WITH HER IMPORTS

HER Holding is not liable to Grant because HER Holding was not formed until Grant stopped working for HER Imports.  In Jiao v. Chen, the Southern District recognized that "the FLSA contemplates several simultaneous employers, each responsible for compliance with the Act."  No. 03 Civ. 0165 (DF), 2007 WL 4944767, *31 (S.D.N.Y. Mar. 30, 2007) (internal citations omitted).  While the Second Circuit has not addressed the issue in the context of an

12

FLSA claim, when analyzing the application of single integrated enterprise doctrine to unfair labor practices in a union formation case, the Second Circuit recognized that "the single employer doctrine generally applies where the entities *concurrently* perform the same function and one entity recognizes the union and the other does not." Bricklayers & Allied Craftworkers Local 2, Albany v. C.G. Yantch, Inc., 316 F. Supp. 2d 130, 143 (N.D.N.Y. 2003) (italics original).

Here, HER Holding was not formed until March 6, 2015, which in the same month that Grant stopped providing services to HER Imports.  (Ex. L; Ex. I, ¶ 36.)  Since HER Holding did not yet exist during the time Grant provided services to HER Imports, HER Holding could not have been a joint employer of Grant or a single integrated enterprise with HER Imports. Therefore HER Holding cannot be liable to Grant, and the court should grant the summary judgment motion as to HER Holding.

**POINT II:**
**THE COURT SHOULD DISMISS EZJR FROM THIS ACTION BECAUSE**
**EZJR DID NOT EMPLOY GRANT AND CANNOT BE HELD LIABLE**
**BASED ON THE AGREEMENT WITH HER IMPORTS**

**A.     EZJR Is not a Joint Employer of Grant**

The Court should dismiss EZJR from this case because EZJR is not a joint employer of Grant.  "The determination of whether defendants are plaintiffs' joint employers is to be based on the circumstances of the whole activity" "viewed in light of economic reality." Hart v. Rick's Cabaret Int'l, Inc., 967 F.Supp. 2d 901, 939 (S.D.N.Y. 2013) (internal citations and quotations omitted).  To evaluate allegations of joint employment, courts in the Second Circuit first apply a four factor test to evaluate whether the "economic reality" of the putative joint employer's relationship with workers shows that the company is an employer, including evaluating whether the alleged joint employer: (1) had the power to hire and fire the employees; (2) supervised and

13

controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.  Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984).

Next, courts apply the six factor test developed in Zheng v. Liberty Apparel Co. to determine if the purported joint employer exercises functional control over workers; this involves examining: (1) whether the purported joint employer's premises and equipment were used for the purported employee's work; (2) whether the purported immediate employer had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which the purported employee performed a discrete line job that was integral to the purported joint employer's process of production; (4) whether responsibility under the contracts could pass from one immediate employer to another without material changes; (5) the degree to which the purported joint employer or its agents supervised the purported employee's work; and (6) whether the purported employee worked exclusively or predominantly for the purported joint employer.  355 F.3d 61, 72 (2d. Cir. 2003).  Notwithstanding the ubiquity of the Carter and Zheng tests, in Zheng the Second Circuit – giving instructions upon remanding the case to the Southern District – was careful to point out that "the court is also free to consider any other factors it deems relevant to its assessment of the economic realities." 355 F.3d at 72 (instructions on remand to district court).

In Hugee v. SJC Group, Inc., the Court dismissed a claim of joint employment against a defendant where the plaintiff was employed as a security guard by the defendant's subcontractor, SJC, even though the defendant, NESCTC, required the plaintiff to report his arrivals and departures from the worksite to NESCTC and to fill out the NESCTC's timesheets, and NESCTC inspected the worksite monthly and provided training to the plaintiff.  13 Civ. 0423

14

(GBD), 2013 WL 4399226, *15-17 (S.D.N.Y. Aug. 14, 2013).  The court found that the first Carter factor was absent because the plaintiff did not allege NESCTC could hire or fire him.  Id. at *13-14.  The court found that the second and fourth Carter factors and the fifth Zheng factor were absent because NESCTC's requirements – that plaintiff report arrivals and departures and fill out timesheets, NESCTC's maintenance of the resulting records, all inspections by the NESCTC, and all training provided by NESCTC – related to quality control by NESCTC, not to supervision or directing the terms and conditions of the plaintiff's employment.  Id. at *15-23 & *28.  As the court explained, "[q]uality control and compliance monitoring that stem from the nature of the business – that is, from the nature of the goods or services being delivered – are qualitatively different from control that stems from the nature of the relationship between the employees and the putative employer."  Id. at *17 (internal citations omitted).

Continuing to the third Carter factor, the Hugee court found that it weighed against a finding of joint employment because SJC's principal "issued his paychecks on behalf of Defendant SJC."  2013 WL 4399226 at *21.  However, in Reiseck v. Univ. Commc'ns., the Southern District found this factor absent for a different reason:

> Plaintiff argues that material issues of fact exist as to whether Bernstein is an "employer" under the broad definition of that term found in the FLSA. First, plaintiff notes that the department headed by Bernstein was responsible for calculating the commissions due to plaintiff. In this capacity, Bernstein and his staff communicated directly with plaintiff regarding the amount of her commissions. Gollan testified in deposition that he may even have had a personal meeting with Bernstein regarding the amount of commissions due to plaintiff after her departure. These commissions comprised a sizeable percentage of plaintiff's total compensation. ***There is no evidence, however, that this role afforded Bernstein any meaningful control over the terms of plaintiff's compensation.*** Rather, the evidence establishes that Bernstein and his department paid out commissions in accordance with the terms established by Gollan. In short, Bernstein merely processed the payments due to plaintiff. This is insufficient to establish that Bernstein was an employer under the FLSA.

No. 06 Civ. 0777 (TPG), 2012 WL 3642375, *16-17 (S.D.N.Y. Aug. 23, 2012) (emphasis added).

Moreover, the Court in Hugee found that the first Zheng factor weighed against joint employment because the plaintiff worked at locations assigned by the SJC, not NESCTC's premises, and the plaintiff did not allege that he used NESCTC's equipment.  2013 WL 4399226 at *23.  The court also found that the second Zheng factor weighed against joint employment because although the plaintiff alleged that SJC contracted primarily with NESCTC, "the Second Circuit has cautioned that the absence of a broad client base … is not anything close to a perfect proxy for joint employment (because [it is] perfectly consistent with a legitimate subcontracting relationship)." Id. at *27 (internal citations omitted). "Therefore," the Hugee court continued, the second Zheng factor weighed against joint employment because "even if SJC contracted primarily with NESCTC, Plaintiff fails to allege that SJC could *only* contract with NESCTC and no other company."  Id. at 26 (emphasis added).  The Southern District applied the same reasoning in Jean-Louis v. Metro. Cable Commc'ns., Inc.:

> Second, it seems strange to conclude that Time Warner controls Metro technicians because Metro contracts only with Time Warner where it is undisputed that Time Warner does not control whether Metro does so.  If Time Warner prohibited Metro from contracting to provide installation services for any other cable provider, that fact along with some evidence that Time Warner supervised or otherwise controlled technicians' conditions of employment would suggest to a greater degree that Metro was separate in name only.  But where there is no evidence that Metro's contracting with Time Warner alone is the product of anything other than its own business decision, finding that Time Warner controlled Metro for that reason alone turns the economic reality test on its head.

838 F. Supp. 2d 111, 136-37 (S.D.N.Y. 2011).

Analyzing the third Zheng factor – the extent to which the plaintiff performed a discrete line job that was integral to the purported joint employer's process of production – the Hugee court observed that "this factor might apply with somewhat less vigor where the parties are

16

engaged in providing a service rather than manufacturing a product"; since the plaintiff performed a service, the court found the factor weighed against joint employment.  2013 WL 4399226 at *27.

The Hugee court also found that the fourth factor weighed against a finding of joint employment because the plaintiff "fails to allege any facts indicating that he could have maintained any relationship with NESCTC even if he were not employed by SJC."  Id. at *28. Recognizing that "[w]here . . . employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, this factor does not in any way support the determination that a joint employment relationship exists."  Id. at *28.  Applying similar reasoning, the court in Jean-Louis stated:

> There is no evidence that Metro technicians would continue installing Time Warner cable if Time Warner severed its relationship with Metro. Since the undisputed evidence shows that, rather than hiring technicians, Time Warner hires contractors who hire technicians, all the evidence suggests that when an Installation Company dissolves, technicians wishing to continue working on behalf of [Time Warner] are required to apply and be hired for a position from another Installation Company.  Accordingly, the evidence suggests that Metro technicians work for Time Warner only to the extent that their direct employer is hired by that entity. The fourth Zheng factor therefore weighs against finding that Time Warner jointly employs Metro technicians.

838 F.Supp. 2d at 135 (internal quotations and citations omitted).

Finally, while the courts in Hugee and Jean-Louis both found that the plaintiffs worked predominantly for the putative joint employer, the courts deemed that factor insufficient to demonstrate joint employment.  Hugee, 2013 WL 4399226 at *28, Jean-Louis, 838 F.Supp. 2d at 137.

Here, EZJR had even less involvement with Grant than the NESCTC had with the plaintiff in Hugee; not only did EZJR lack the authority to hire or fire Grant, but the evidence shows that EZJR did not supervise Grant or dictate any of the terms of her services she provided

17

to HER Imports.  (Ex. B, 62:19-63:3.)  As Grant admitted in her deposition, she never met Hall in person, she never received a single phone call from him, and the only email she received concerned two real property leases.  (Ex. J, 68:14-70:6.)   There is no evidence to show that Hall ever visited the Brooklyn location.  In fact, Hall's visits to HER Import locations are extremely limited.  (Ex. B, 31:7-13.)  The only payment EZJR made on Grant's behalf – the wire to the bank account of Hicks – was made at the request of HER Imports without Hall even realizing it was for Grant at the time, and the amount of the wire was reimbursed to EZJR through a royalty offset.  (Ex. B, 49:16-51:5.)  The circumstances of the payment are closer to the facts in Reiseck than to the facts in Hugee because EZJR only processed the payment instead of controlling Plaintiff's compensation.  (Ex. B at 49:16-51:5.)  These facts indicate that neither Hall nor anyone else at EZJR ever exerted any control over Grant's work, let alone over her scheduling, and EZJR had no say in how much Grant was paid for her services as an independent contractor. (Ex. B, 62:19-63:3.)

Application of the Zheng factors also shows that no employee-employer relationship existed between EZJR and Grant.  The first factor of the Zheng test (whether the purported joint employer's premises and equipment were used for the purported employee's work) weighs against a finding that EZJR was Grant's employer because Grant never worked at EZJR's facilities (its office in Las Vegas, Nevada) or even provided any services related to EZJR's core business, its eCommerce platform.  (Ex. J, 16:3-6, 18:18-20:11, 68:3-10; Ex. C, p. 6.)  To the contrary, the services Plaintiff provided as an independent contractor at the HER Imports' Brooklyn store substantially fall under the responsibilities that HER Imports retained for itself to perform under the Agreement, including the provision of physical sales facilities (¶ 3.1), staffing

each physical location (¶ 3.2), and in store and field promotion (¶ 3.3).  (Ex. A, ¶ 3; Ex. J, 16:3-6, 19:20-24.)

The same holds true for the remaining factors of the Zheng test.  The fifth factor (the degree to which the purported joint employer or its agents supervised the purported employee's work) weighs against a finding that EZJR was Grant's employer because Hall's minimal interaction with Grant shows that EZJR never supervised Grant.  (Ex. B at 62:19-63:3; Ex. J, 68:14-70:6.)  The third factor (the extent to which the purported employee performed a discrete line job that was integral to the purported joint employer's process of production) does not apply here because Plaintiff was providing a service, not producing a good. (Ex. J at 16:3-6, 18:18-20:11.)   Unlike  in Hugee and Jean-Louis, the sixth factor (whether the purported employee worked exclusively or predominantly for the purported joint employer) is inapplicable here. Cf. Hugee, 2013 WL 43992256 at *29-30, Jean-Louis, 838 F.Supp. 2d at 135.   The services Grant provided as an independent contractor to HER Imports  – primarily operation of the physical locations of HER Imports in Brooklyn and Newark and in-store and field promotions – do not coincide with the services that EZJR provides under the Agreement, namely "improving the sales performance of brands, products and services by way of its proprietary eCommerce platform," or with fulfilling EZJR's responsibilities under Paragraph 2 of the Agreement, including purchasing inventory, online marketing, branding, promotion through press releases, events, celebrity endorsements and trade shows, advertising, establishing merchant accounts, providing Point of Sale (POS) equipment, processing of sales, online sales and fulfillment, and administrative functions.  (Ex. J, 16:3-6, 18:18-20:11; Ex. A, ¶ 2; Ex C.)

Here, as in Hugee, the second factor (whether the purported immediate employer had a business that could or did shift as a unit from one putative joint employer to another) also weighs

against a finding that EZJR was Grant's employer because EZJR's approval does not extend beyond the goods being sold to the services Grant provided; instead Hall testified that "as far as them selling other products, they could be selling, you know, wheat and oil for all I know." (Ex. A, ¶ 2; Ex. B at 33:14-25.)  Equally important, like the immediate employer in <u>Jean-Louis</u>, HER Imports chose to work with EZJR as a business decision and not because EZJR controls HER Imports (indeed, Hall testified that EZJR does not control HER Imports). (Ex. A ¶ 1.1; Ex. B at 32:12-21.)

Finally, the fourth factor (whether responsibility under the contracts could pass from one immediate employer to another without material changes) weighs against a finding that EZJR was Grant's employer because the evidence demonstrates that, like the plaintiff in <u>Hugee</u>, Grant had no connection to EZJR except through HER Imports, which requested that EZJR process a payment to Grant.  (Ex. B at 49:16-51:5.)  <u>See</u> <u>Hugee</u>, 2013 WL 4399226 at *28.  Equally important, given that HER Imports has exclusive responsibility over staffing the physical locations in the Agreement (Ex. A, ¶ 3.2), combined with Cronister's testimony under oath that he has sole decision-making authority on changes to compensation and responsibility for communicating those changes to EZJR (Ex. K, 14:10-16:6), and Hall's uncontroverted testimony that he does not visit the physical locations except to check the inventory (Ex. B, 31:7-13.), there is no evidence in the record to suggest that EZJR would continue to work with any of the HER Imports staff if EZJR chose to terminate the Agreement.  Overall, as in <u>Hugee</u>, EZJR lacks functional control over the staff of HER Imports' physical locations to extent that EZJR's interaction with the HER Imports staff is limited to preserving its rights and honoring its obligations under the Agreement, rather than controlling the terms and conditions of the work of

the HER Imports staff.  See Hugee, 2013 WL 4399226 at *16, 30-31.   Therefore, EZJR was never a joint employer of Grant.

**B.      Grant Cannot Establish that EZJR Is Liable to Grant on the Basis that EZJR Is a Single Integrated Enterprise with HER Imports**

Grant cannot establish that EZJR is liable to Grant by arguing that EZJR is a single integrated enterprise with HER Imports. "The single integrated enterprise doctrine applies to situations in which two nominally separate entities are actually part of a single integrated enterprise.  The Second Circuit has never endorsed this theory of liability in the FLSA context, and district courts in this Circuit are divided on its application to FLSA and NYLL cases." Khereed v. W. 12th St. Rest. Grp., LLC, Case No. 15-cv-1363 (PKC), 2016 WL 590233, *13 (S.D.N.Y. Feb. 11, 2016) (holding that the plaintiff cannot demonstrate that two limited liability companies, each of which operates a restaurant, are a single integrated enterprise based on the use by the two LLCs of similar employee handbooks, one common managing member, one employee who worked at both restaurants simultaneously and one employee who worked first at one restaurant and later the other) (internal citations omitted).  As the Court explained in Hart v. Rick's Cabaret:

> The integrated enterprise test is inapposite because an "enterprise" is not always coextensive with an "employer" under the FLSA.  As defined in the [FLSA], the term enterprise is roughly descriptive of a business rather than of an establishment or of an employer although on occasion the three may coincide.  The enterprise may consist of a single establishment which may be operated by one or more employers; or it may be composed of a number of establishments which may be operated by one or more employers.

967 F. Supp. 2d at 955 n.16.

To the extent the district courts have exercised their discretion to apply the "integrated enterprise" test, the district courts in the Second Circuit have drawn on cases that apply the test to claims arising under other labor and employment statutes including Title VII and unfair labor

practice claims relating to union formation.  Herman v. Blockbuster Entm't Grp. 18 F.Supp. 2d 304, 309 (S.D.N.Y. 1998); Bricklayers & Allied Craftworkers Local 2, Albany, 316 F. Supp. 2d at 143.  Generally, to determine if separate businesses operate as a single, integrated enterprise, "courts consider (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control"; the court in Herman stated that "in assessing these factors in Title VII actions, courts should focus their analysis on the second factor: centralized control of labor relations." 18 F.Supp. 2d at 309.  Also important, the Herman court found that two companies did not have interrelated operations because instead of sharing services the way that a single company would, one company, Discovery Zone, paid the other company, Blockbuster, for each service that Blockbuster provided to Discovery Zone under a "Management Services Agreement" between the two companies.  18 F.Supp. 2d at 307.

Here, the relationship between HER Imports and EZJR is no more integrated, and in some respects less integrated, than the two companies in Herman (Discovery Zone and Blockbuster).  First, there is no centralized control of labor relations; presently, all of the hiring, firing and compensation decisions for HER Imports are made by Cronister, who is not employed by EZJR, and while he keeps EZJR apprised of his personnel decisions, EZJR does not have control over labor relations.  (Ex. K, 14:10-16:6.)  Therefore, there is no evidence of "centralized control of labor relations."  Herman, 18 F. Supp. 2d at 309.  Second, as in Herman, the fact that EZJR supplies payroll and other services to HER Imports under the Agreement is not a basis to rule that EZJR and HER Imports have interrelated operations because, instead of sharing those services, HER Imports pays EZJR for them.  (Ex. A, ¶¶ 2.4 & 4.1; Ex. D, ¶ 1.1; Ex. B at 49:16-51:5.)

Moreover, there is neither common management nor common ownership between EZJR and HER Imports.  Hall confirms that EZJR and HER Imports are "two separate companies.  We certainly coordinate activities like you would with any business partner, but I have no say in any decisions they may make, and they have no decisions – no say in any decision regarding EZJR." (Ex. B, 32:12-21.)  There is nothing else in the record to suggest that Cronister or any other manager of HER Imports is a manager of EZJR or that Hall or any other manager of EZJR is a manager of HER Imports; the Agreement undercuts any such claim by defining the obligations of EZJR and HER Imports to one another as an arm's length agreement between independent contractors.  (Ex. A, ¶ 1.1.)  Finally, EZJR and HER Imports do not own any part of one another, as Hall confirms in his response to counsel's question about why the Agreement is an arm's length transaction:  "[a]nd at the time we entered into it, the two separate parties had no co-ownership, no involvement with each other, nothing like that." (Ex. B, 62:13-18.)[4]  Therefore, none of the <u>Herman</u> factors point to a single integrated enterprise that would justify a finding EZJR had any responsibility for HER Imports' relationship with Grant.

Finally, Hall and Cronister confirm that EZJR and HER Imports do not have common ownership.  (Ex. B, 62:13-18; Ex. K, 36:12-15.)

Perhaps most important, even if EZJR can be considered part of an integrated enterprise with HER Imports (and Defendants do not admit that EZJR is an integrated enterprise with HER Imports, particularly during the time period that Grant provided services to HER Imports), that integration is not sufficient to make EZJR liable to Grant because ***EZJR did not exercise any control over Grant***.  Under the FLSA "companies that are part of an integrated enterprise or

---

[4]     Amendment #2 gave ***HER Holding*** stock in EZJR, but that was on March 6, 2015 the same month that Plaintiff stopped providing services to HER Imports. (Ex. E; Ex. A, ¶ 12.) The timing is relevant because, as previously discussed, plaintiff must simultaneously work for two companies to satisfy the joint employment or single integrated enterprise tests.  <u>Jiao v. Chen</u>, 2007 WL at *31.

engaged in a joint venture may nevertheless employ separate people and, ***absent control***, are not liable for the separate employees of joint ventures." Lopez v. Acme Am. Envtl. Co., No. 12 Civ. 511 (WHP), 2012 WL 6062501, *10-11 (S.D.N.Y. Dec. 6, 2012) (dismissing FLSA claim against corporate defendants who had no control over plaintiff employees) (emphasis added).  In Lopez, the Court dismissed claims against three companies affiliated with the direct employer of the plaintiffs, Acme Environmental, because, despite the fact that the defendant affiliated companies served a common clientele, and shared office space, supplies, a common bookkeeper, a common accountant, and a common general manager with Acme Environmental, "Acme Environmental does not share its cleaning business with other companies in the group" and "[w]hen Acme Environmental performed on its contracts, responsibility for and supervision of Acme Environmental's employees never passed to the Corporate Moving Defendants." Id. at *13-14.  Even the fact that "[p]laintiff employees would work with the employees from other Acme Group companies to complete a job," including "clean[ing] parts, such as belts, that had been removed from appliances by Acme Repairs employees," such cooperation amongst employees of the various companies did not make Acme Repairs or the other defendant affiliated companies liable to the plaintiffs.  Id. at *4.

Here, as when comparing this action to Herman, the facts shows that the level of involvement between EZJR and HER Imports does not come close to the integration present in Lopez and therefore provides even less of a basis for a finding of "integrated" activity.  Unlike the plaintiff employees in Lopez, who shared offices and cleaning supplies with other companies, Grant never used EZJR's offices in Las Vegas or EZJR's e-commerce platform, or worked with EZJR personnel to complete tasks.  Lopez, 2012 WL 6062501 at *10-11.  To the extent that EZJR used the facilities of HER Imports, the Agreement calls for EZJR to pay fees

for using the facilities of HER Imports. (Ex. A.)  To the extent EZJR conducted payroll functions for HER Imports, the Agreement and Amendment #1 required HER Imports to reimburse EZJR for those services or accept offsets against royalties owed to HER Imports.  (Ex. B at 43:19-44:6; Ex. A, ¶¶ 2 & 4; Ex. D.)

Finally, to the extent that EZJR and HER Imports were collaborating, Grant's role can be analogized to the role of the cleaning employees in Lopez, in that she provided in-store customer service and field promotion services as an independent contractor for *HER Imports*, while EZJR provided online sales and promotion through press releases, events, celebrity endorsements and trade shows.  (Ex. A; Ex. J.)  Therefore, EZJR and HER Imports are not a single integrated enterprise as a matter of law and the relationship between EZJR and HER Imports does not make EZJR liable to Grant.

## CONCLUSION

In light of the foregoing, the Court should grant summary judgment in favor of Her Holding and EZJR, dismiss the claims against Defendants, and award all such other and further relief the Court deems just and proper.[5]

Dated:      New York, New York
            August 12, 2016

                                  /s/ James J. DeCristofaro, Esq.
                                  James J. DeCristofaro, Esq.
                                  DCL Firm (DeCristofaro Law)
                                  260 W 26th Street, Suite 7Q
                                  New York, New York 10001
                                  Tel.  (212) 500-1891
                                  Fax (917) 591-0289
                                  Email:  james@dclfirm.com

                                  *Attorneys for Defendants HER Holding, Inc.*
                                  *and EZJR, Inc.*

---

[5]     There is similarly no evidence of a "joint" or "integrated" relationship between HER Imports NY, LLC and EZJR, and the motion for summary judgment in favor of EZJR should be granted on that basis as well.