UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

LUBLEEJOY GRANT,

                Plaintiff,

                - against -

HER IMPORTS NY, LLC, HER IMPORTS
LLC, HER HOLDING, INC., and EZJR, INC.

                Defendants.

------------------------------------------------------------X

**REPORT AND RECOMMENDATION**
**15 CV 5100 (DLI)(LB)**

**BLOOM, United States Magistrate Judge:**

      Plaintiff, Lubleejoy Grant, brings this action pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York Labor Law ("NYLL"), N.Y. Lab. Law § 190 *et seq.* and § 650 *et seq.* Plaintiff alleges that defendants failed to compensate her for the hours that she worked as required under the FLSA and the NYLL. Plaintiff seeks an award of compensatory damages, statutory damages, prejudgment interest, as well as reasonable attorney's fees and costs. Defendants HER Imports, LLC and HER Imports NY, LLC (hereinafter collectively referred to as "HER Imports") have defaulted in this action. Defendants HER Holding, Inc. ("HER Holding") and EZJR, Inc. ("EZJR") move for summary judgment on the ground that neither entity employed plaintiff. Plaintiff cross-moves for summary judgment on several grounds. The Honorable Dora L. Irizarry referred the parties' cross-motions to me for a Report and Recommendation in accordance with 28 U.S.C § 636(b). For the following reasons, the parties' cross-motions for summary judgment should be granted in part and denied in part.

## BACKGROUND

      Plaintiff met Patrick Terry, founder of the HER Imports brand, in July 2013 at a hair salon in Brooklyn. HER Imports is a brand of women's hair extensions and retail beauty products sold both

domestically and internationally. The record reflects that when plaintiff met Terry in July 2013, HER Imports consisted of a handful of pop-up shops throughout the United States. Terry had leased the Brooklyn retail location at the time plaintiff was hired, but there was no electricity or internet in the store. Plaintiff got the Brooklyn store up and running, then, began selling HER Imports' brand hair extensions in the store by day and promoting the products at clubs four nights per week. Plaintiff reported to Terry, co-owner Jerome Reid, and national manager David Cronister throughout her employment. Plaintiff was the only person who had keys to the store and she was the sole staff member in charge of selling products, tracking the revenue, and managing the inventory. In addition to being the only person with keys to the Brooklyn store, plaintiff also opened a HER Imports location in Newark, New Jersey where she hired and trained the staff. Plaintiff also filed civil cases against individuals relating to merchandise and trademark infringement when Terry instructed her to do so.

Plaintiff worked for HER Imports for just over a year-and-a-half, resigning in March 2015. Before plaintiff resigned, HER Imports entered into a "Marketing & Selling Agreement" with defendant EZJR and its CEO, Barry Hall, whereby the entities split the operational responsibilities of HER Imports' domestic business. Barry Hall soon incorporated HER Holding (naming HER Imports' national manager, David Cronister, as President) for the sole purpose of receiving the royalty payments that EZJR paid to HER Imports under their marketing agreement. In the years since EZJR and HER Imports entered into their first agreement, the business has grown; HER Imports' brand products are now sold online and in more than a dozen retail locations throughout the United States.

The facts surrounding plaintiff's employment are mostly in dispute and there is little record evidence demonstrating who controlled what when it comes to plaintiff's employment. The record is further complicated because the two named defendants that actually hired plaintiff in July 2013, HER Imports, LLC and HER Imports NY, LLC, have defaulted in this action. However, Patrick Terry was deposed and his deposition is part of the record. The parties' cross-motions for summary judgment

demonstrate that the employment agreement between plaintiff and HER Imports was informal and poorly documented. Nevertheless, the FLSA and the NYLL exist to protect employees who where deprived wages owed to them under the law. The central question of whether plaintiff qualifies as an "employee" under the law, or was an "independent contractor," cannot be resolved on the instant record. There are material issues of fact in dispute. However, the record establishes that HER Holding operated as a single integrated enterprise with Her Imports and EZJR operated as a joint employer with HER Imports and HER Holding. Therefore, if plaintiff is found to be an employee under the FLSA and if plaintiff can establish that she was denied wages, defendants will be liable.

## PROCEDURAL HISTORY

Plaintiff commenced this action on September 1, 2015. ECF No. 1. All defendants answered the complaint on October 23, 2015. ECF No. 13. Defendants' counsel, James J. DeCristofaro, moved to withdraw as the attorney of record for HER Imports NY, LLC and HER Imports, LLC citing irreconcilable differences. ECF No. 23. The Court granted the application on July 6, 2016.[1] After repeatedly warning corporate defendants HER Imports NY, LLC and HER Imports, LLC, that they could not appear in this matter without counsel, they nevertheless failed to retain new counsel. Upon plaintiff's request, the Clerk of Court entered certificates of default against HER Imports NY, LLC and HER Imports, LLC on March 15, 2017. ECF Nos. 49, 50.[2]

The parties completed discovery on July 1, 2016. See Orders dated May 20, 2016 and July 6, 2016. Defendants twice moved to compel plaintiff's 2013, 2014, and 2015 tax returns. ECF Nos. 24, 33. The Court denied both motions. Defendants' motion to set aside my August 4, 2016 Order was likewise denied and the parties were directed to complete their summary judgment briefing. ECF No. 53. Defendants HER Holding and EZJR move for summary judgment, ECF No. 56, plaintiff cross-

---

[1] James DeCristofaro remains the attorney of record for defendants HER Holding and EZJR.
[2] No motion for a default judgment against these defendants has been filed.

moves for summary judgment, ECF No. 62, and the parties filed their oppositions and replies. See ECF Nos. 56-71.

## STANDARD OF REVIEW

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). A fact is material if it is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (quoting Anderson, 477 U.S. at 248). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000); see also Baker v. Home Depot, 445 F.3d 541, 543 (2d Cir. 2006) (resolving all ambiguities and drawing all inferences in favor of the nonmoving party on summary judgment).

However, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. Anderson, 477 U.S. at 257. "'Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact.'" Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Id. (quoting Anderson, 477 U.S. at 252).

**DISCUSSION**

**PLAINTIFF'S EMPLOYMENT CLASSIFICATION UNDER THE FLSA**

"The determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts, determined by reference not to isolated factors, but rather upon the circumstances of the whole activity." Saleem v. Corporate Transportation Group, Ltd., 854 F.3d 131, 140 (2d Cir. 2017) (internal citations and alterations omitted). The "economic reality test" used to determine whether an individual is an employee or independent contractor was set forth in Brock v. Superior Care, Inc., 840 F.2d 1054, 1058-59 (2d Cir. 1988), and requires that the Court weigh a number of "non-exclusive factors." Ethelberth v. Choice Sec. Co., 91 F.Supp.3d 339, 350 (E.D.N.Y. 2015) (citing Brock, 840 F.2d at 1058-59). The factors to weigh are:

> (1) the degree of control the employer exercises over the workers, (2) the workers' opportunity for profit or loss and their investment in the employer's business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship between the employer and employee, and (5) the extent to which the work is an integral part of the employer's business.

Id. Courts consider the first factor in the Superior Care test—the *degree of control* that the purported employer has over the purported employee's work—to be "critical" to the inquiry. Mahoney v. Amekk Corp., 14-CV-4131 (ENV)(VMS), 2016 WL 6585810, at *7 (E.D.N.Y. Sept. 30, 2016), report and recommendation adopted in full, 2016 WL 6601445 (E.D.N.Y. Nov. 7, 2016). When determining what "degree of control" an entity has over an individual, the court considers "whether the worker: '(1) worked at [her] own convenience; (2) was free to engage in other employment; (3) received fringe benefits; (4) was on the employer's payroll; and (5) was on a fixed schedule'" Id. (quoting Bynog v. Cipriani Group, Inc., 802 N.E.2d 1090, 1093 (2003)). None of these factors are dispositive, rather the Court must always consider the totality of the circumstances when determining the "economic reality" of the employment arrangement between the parties. Ethelberth, 91 F.Supp.3d at 350.

## I.   Plaintiff's Responsibilities for HER Imports

In July 2013, plaintiff's friend introduced her to Patrick Terry, founder and operator of HER

Imports, LLC and HER Imports NY, LLC. Plaintiff's 56.1 Counter-Statement ("Plt. 56.1"), ECF No.

63, ¶¶ 40, 41.[3] According to Terry's testimony, sometime in the summer of 2013, he met plaintiff in

a second-floor hair salon located at 851 Quincy Street in Brooklyn, New York.[4] Def. 56.1 ¶ 5. Terry

testified that he was there to train a different employee hired to run the HER Imports retail location

on the first floor, but the employee never showed up and some inventory had been stolen so he was

contemplating closing the location. Terry Dep. 12:16-17. Plaintiff was visiting her friend at the hair

salon and met Terry when she showed interest in purchasing hair extensions from him. Id. 12:23-

13:2. Plaintiff offered to work for Terry. Although skeptical at first, Terry testified that he decided to

"see how it goes" when plaintiff offered to sell HER Imports hair extensions and split the profits with

him. Id. 13:3-7. Terry testified that from then on, "Joy was on a verbal contract engaged as a contractor

on behalf of HER Imports NY, LLC." Id. 10:7-9.

According to plaintiff, she was at her friend's salon in July 2013, when a customer from the

HER Imports store downstairs came into the salon complaining that there was no one staffing the

store. Plt. Dep. 15:15-16:3. Plaintiff's friend called Terry on the phone to tell him that the store was

unattended, and Terry allegedly said, "Well, could you grab somebody for me," and the friend told

---

[3] The facts are taken from the undisputed assertions set forth in Defendants' Local Civil Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1") [Docket Entry No. 57], the declaration of Barry Hall in support of defendants' motion for summary judgment ("Hall Decl.") [Docket Entry No. 58] and the exhibits attached thereto, the declaration of David Cronister in support of defendants' motion for summary judgment ("Cronister Decl.") [Docket Entry No. 60] and the exhibits attached thereto, plaintiff's deposition [Docket No. 59], the additional declarations in support of defendants' motion for summary judgment [Docket Entry Nos. 67, 68], Plaintiff's Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Plt. 56.1") [Docket Entry No. 63], the declaration of Matthew Blit in Support of Plaintiff's Cross–Motion for Partial Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment ("Blit Decl.") [Docket Entry No. 64] and the exhibits attached thereto, which includes Patrick Terry's Deposition ("Terry Dep.") [ECF No. 64-3], Defendants' Counter-Statement of 56.1 Material Facts ("Def. Counter-Stmt.") [ECF No. 66] and the supplemental declarations attached thereto [ECF Nos. 67, 68]. Unless otherwise noted, the facts are not in dispute and are supported by evidence in the record. As to each motion, the Court construes the facts in the light most favorable to the non-moving party. Pinto, 221 F.3d at 398.

[4] 851 Quincy Street, Brooklyn, New York is listed as the principle place of business for Her Imports NY, LLC. The retail location that plaintiff opened and staffed remains in business to this day.

him plaintiff could take over. Id. 16:4-6. Plaintiff testified that she spoke to Terry by phone later that day and they "worked out the agreement from there." Id. 16:9-10. Terry told plaintiff that he would send her some money through a Bank of America account to get started and over the next two months she set up the store. Id. 16:10. Plaintiff testified, "I paid myself until he came. I was corresponding with Patrick [Terry] via phone daily at that time." Id. 18:18-20. Plaintiff testified that she was in charge of paying the rent, setting up the phone and internet, paying the electricity bill, depositing revenues, interacting with customers, and promoting the store. Id. 19:16-20. Plaintiff was the only person who had keys to the Brooklyn store until 2014 when David Cronister became the national manager. Id. 40:10-14. Plaintiff managed the inventory, storing it in the basement of the retail location, and notifying Terry of what was sold and what remained so that he could decide what inventory needed to be ordered. Id. 41:19-42:9. According to plaintiff's testimony, she did not meet Terry until two months into her employment when he came to visit. Id. 25:7-21.

Plaintiff maintains that she worked in the store Monday through Saturday from 11:00 a.m. to 7:00 p.m. every week, in accordance with the posted store hours.[5] Plt. Dep. 28:5-23. Plaintiff testified that Terry told her to be available whenever a customer contacted her to meet at the store to purchase products, even if it was outside of the posted hours. Id. 29:15-17. Terry, too, recognized that plaintiff's position required her to be on-call at times. Terry testified that the store was open "between noon and seven typically…. And then we would say by appointment only though. So people would call ahead or text and say, hey, I need to get some hair, and [plaintiff] would meet them there and facilitate a transaction." Terry Dep. 34:22-35:3. Terry testified that he "didn't keep track of [plaintiff's] hours. She kept track of her own hours." Id. 21:5-7. When asked the best way to substantiate how many hours plaintiff worked, Terry testified that "there is no way. It's not documented, right. This wasn't a big corporation at the time." Id. 33:24-34:1.

---

[5] Defendants dispute that plaintiff worked these hours. Def. Counter-Stmt. ¶ 42.

Plaintiff maintains that in addition to the posted store hours, she worked four nights per week promoting the brand "[a]t clubs, strip clubs, party clubs, bars, the train, station, everywhere a lot of people were. A lot of women, even men." Plt. Dep. 20:9-11. When asked who chose the locations where she promoted after hours, plaintiff responded, "I did and Patrick too. He told me about, like, the strip clubs, like the strippers and stuff like that, like Lust and Starlet, Perfections, gentleman clubs." Id. 20:21-24. Plaintiff testified that as part of the promotion she would pay for drinks at the clubs where she was promoting the brand to get potential customers interested. When asked if she paid for these expenses out of her own pocket, she said, "Absolutely. The only time I didn't have to pay out of my pocket was when Dave came." Id. 32:6-7. She testified that her understanding with Terry was that HER Imports would reimburse her for what she spent promoting in the clubs, "but it never happened." Id. 32:23-25. Terry, instead, felt the store would do well if plaintiff was there selling the products, and that the products did not need additional promotion. He testified that, "[plaintiff] claims she was out in clubs and doing stuff. What this is is somebody who's out at clubs anyway and spending company money to pay for her bottles of champagne, and calling it promoting. That's what that was." Terry Dep. 37:21-25.

Defendants classified plaintiff as an independent contractor and Cronister testified that "she had New York as her own entity."[6] Cronister Dep. 28:11-29:2; Plt. 56.1 ¶ 87. When asked who plaintiff reported to Terry responded, "[h]erself essentially. If the place wasn't making money…then we'd close it down," but otherwise she reported to herself. Terry Dep. 29:23-30:7. Whereas, plaintiff testified that she was reporting to Terry, Reid, and/or Cronister directly and on a daily basis. Plaintiff testified that she spoke with Terry at least every other day and that she communicated with Reid by telephone "all the time." Plt. Dep. 33:9-14, 67:9-13. Plaintiff maintains that she "didn't have the

---

[6] An employer's classification of a plaintiff as an independent contractor is not dispositive of the matter. Superior Care, 840 F.2d at 1059.

power to discount [hair extensions] unless [she] spoke to [Terry]." Id. 21:23-24.  Plaintiff testified that, after David Cronister came on board, she spoke to him every day by phone. Id. 65:22-66:6. Cronister visited New York four times a year to check-in on plaintiff and the store. Id. 65:20-21. Plaintiff spoke to HER Imports' bookkeeper, Georgette Elisha, approximately once a month by both phone and email.[7] Id. 63:9-22. Georgette would contact plaintiff when customers complained about products and ask plaintiff to "ship different merchandise [from the store]…to different stores or to mail it out for the online [orders]." Id. 64:2-7. Plaintiff stated, "It was nothing that I was doing at my own will. This was what was a part of the job. I was the only one here in New York. I was the only one operating the store. No one was here." Id. 29:18-21.

Plaintiff would ask family members and friends to staff the store when she could not be there and she never asked Terry, Reid, or Cronister for permission to do so. Plaintiff regularly asked friends Stephanie and Nicky to help out and she paid them "with [Terry's] permission out of the store cash." Plt. Dep. 40:21-41:14. "Well, I had people that I put into the store because I had to, like, go to court and do different things to promote with the stylists during the day. So it was different people that I had to relieve me, but they weren't hired by Patrick."[8] Id. 40:21-25. Terry testified that plaintiff staffed the store with others so she could go on vacation. Terry Dep. 18:18-19:17. Plaintiff also claims she was told to pay a disc jockey, named DJ Norie, out of the till on a weekly basis for his promotions of the brand, Plt. Dep. 75:12-76:25, despite the fact that Terry testified that he had not hired plaintiff to engage in promotional work outside of the store. Terry felt that plaintiff was essentially enriching her friends and family by "taking store funds and giving it to her sister and calling her sister a

---

[7] "HER Imports NY, LLC is an entity that was created by [ ] Georgette Elisha who was a bookkeeper that I retained at the time, and that entity was created to operate a retail store in Brooklyn, New York." Terry Dep. 9:5-9.

[8] Plaintiff testified that if she was not in the store it was because she was on business for HER Imports. Plaintiff stated, "I went to Manhattan to a place where we're subpoenaing documents or I went to the marshal's office on a particular case that we had going on that I was taking care of." Plt. Dep. 62:2-5. She testified that she "went to Westchester Court and filed a civil suit against a woman who defrauded the company for merchandise, things of that nature. That's how I could account when I wasn't there, but personal time that I wasn't there it was clear, because I never cheated him or took time that I wasn't working." Plt. Dep. 62:6-12.

promoter…she found a way to take money and give it to her friends as well." Terry Dep. 38:1-7. The parties do not dispute that Terry gave plaintiff business cards and promotional flyers that plaintiff says she used to promote the business. Plt. 56.1 ¶ 47.

Plaintiff claims that she was required to sign a non-compete agreement. Specifically, plaintiff testified that "[i]t was a non-compete that was an agreement that I signed when I provided a copy of my social security card and a copy of my New York State ID to Georgette. She also sent me a non-compete that I need to sign so any other business outside of HER Imports in the same business I couldn't perform any services." Plt. Dep. 83:8-14. Other than plaintiff's testimony there is no record evidence that there was ever a signed non-compete agreement, and HER Imports, who plaintiff alleges required her to sign the non-compete, has defaulted. Plt. 56.1 ¶ 54; Def. Counter-Stmt. ¶ 54. Furthermore, defendants maintain that Georgette sent plaintiff four separate emails attaching personnel forms that plaintiff never completed or returned, "but a non-compete agreement was not attached to any of those emails." Def. Counter-Stmt. ¶ 160. Thus, whether plaintiff was bound to work only for HER Imports, to the exclusion of all other entities, is a material issue of fact in dispute that cannot be resolved on this record.

The parties submit that plaintiff's hourly rate started at $15.00 per hour. Plaintiff testified that approximately two months after she started working for HER Imports, Terry finally visited New York. He trained her during his visit and raised her compensation to $20.00 per hour for all the work that she had done to open the store. Plt. Dep. 25:7-21. Terry on the other hand testified that their arrangement was that plaintiff would sell the hair extensions and other beauty products at the Brooklyn store and be paid on commission, essentially "split the profit." Terry Dep. 18:8-9, 34:2-4. Terry testified that plaintiff soon asked to be paid hourly when she was not making enough on their initial deal. "But then she wasn't selling enough, or it would be very seasonal, and she said can we change the pay structure? [I told her o]kay, fine, if you want to do like a contractor type scenario, you

can operate the store, whatever hours you are in there, you bill for it and take the money out of the till, and just make sure it's noted in the POS, you can do it that way. . . ." Id. 18:9-17. After that plaintiff "would work and she would take money out of the till." Id. 21:5-7. Plaintiff, too, testified that between July 2013 and September 2014, she paid herself out of the money in the cash register each week and noted how much she took at the top of the till summary receipts. Plt. Dep. 16:18-20. It was not until October 2014 that Georgette began paying plaintiff by check. Def. Counter-Stmt. ¶ 123. Plaintiff testified, prior to that "I was paying myself out of revenue and then Georgette was sending check payment . . . ." Plt. Dep. 55:2-3.

Terry testified that plaintiff "always wanted to be paid in cash." Terry Dep. 15:17. At some point Terry told her, "look, this cash isn't going to work, this business is evolving, other guys are going to run with it. I'm not going to have anything to do with it anymore; you are going to need to get paid by direct deposit or by a che[ck] like everyone else." Id. 16:2-7. Plaintiff told him she could not be paid by check because "[she was] collecting unemployment" which Terry said he "wasn't aware of this." Id. 16:8-9. Terry testified that after that conversation he told her she could only be paid in check, but plaintiff refused to cash the checks and after a few months she called everyone in the business saying she had not been paid in months. Id. 16:15-21. Terry agreed to send her another check, but she said she wanted to be paid by wire into her niece's account. Terry Dep. 16:9-25. Terry testified that he agreed to wire her the money, but HER Imports' bank account froze when he tried to send plaintiff $5,000 on account of what Terry attributes to "the fraud associated with the account she had us send a wire to her." Id. 16:21-17:5. Plaintiff, on the other hand, testified that she complained to Terry because she had not been paid since Georgette left and they owed her $15,000. Plt. Dep. 73:15-23. Plaintiff states that when she told Terry he owed her money that he told her to give him a Bank of America account because that was how he moved money. Id. 73:24-74:3. When asked whether it was her testimony that she kept working despite not being paid for six months, plaintiff

stated, "I had a relationship with Patrick, Dave, and Jerome. I didn't think that they would do me—he made—the relationship that I had with Patrick, he made sure that I was alright up until the point whereas the company was starting to get big and he forgot that, you know, I existed." <u>Id.</u> 74:15-20. Plaintiff resigned in March 2015. Plt. 56.1 ¶ 54.[9]

## II. Whether Plaintiff was an Employee or an Independent Contractor is in Dispute

The record does not establish what level of control defendants exerted over plaintiff's work. The fact that plaintiff opened the store herself, staffed it on her terms, and paid herself from "the till" suggests that she was in control of her hours and pay. Plaintiff also took the initiative to promote the business. When plaintiff resigned, she acknowledges that she took a list of stylists that she generated for promotional purposes during her tenure with HER Imports and stated it was her list. Plaintiff kept the stylists' "phone numbers, e-mails, social media, locations where they work" because "[i]t's not theirs; it's mine. I initiated the contact. All the information that they have in the client base that they have came from me." Plt. Dep. 90:15-18. On the other hand, Terry testified that he "built a website that was a stylist directory, so if somebody came in to buy hair extensions and they wanted to find someone to install them for them, we would maintain a list of stylists we thought were good." Terry Dep. 43:23-44:2. While plaintiff may have kept many of those contacts, Terry's testimony suggests that it was considered part of her job description.

Moreover, Plaintiff testified that she frequently spoke to Terry, Reid, and Cronister regarding her decisions in the business, which weighs in favor of finding that HER Imports exerted control over plaintiff as an employee and the operations at the Brooklyn location. Plaintiff testified that any errands she ran were related to the business and at Terry's request. However, Terry testified that the Brooklyn store "was a disaster, an operational nightmare." Terry Dep. 19:10-11. While defendants' failure to

---

[9] Defendants dispute this fact on the basis that the only documented evidence is plaintiff's own assertion. Def. Counter Stmt. ¶ 54. Yet, they rely on March 2015 as the operative date of plaintiff's resignation throughout their papers.

keep tabs on plaintiff from day-to-day may be a matter they regret, their lack of good management practices does not inure to the business' benefit to determine as a matter of law that plaintiff was an independent contractor.

Plaintiff appears to have been on HER Imports payroll (ECF No. 64, Exh. 2, HER00014) and was paid by four checks between October and December 2014 (ECF No. 68, Exh. O), however, these documents were created in October 2014, fifteen months after plaintiff began working for HER Imports.[10] Defendants submit proof that Georgette sent four emails to plaintiff on February 1, 2014, June 25, 2014, November 7, 2014, and November 19, 2014, with personnel forms attached, however, plaintiff never completed or returned the forms. ECF No. 68, Exh. N. The attached forms included an "Independent Contractor's Agreement," W-9 forms, an "Employee Direct Deposit" form requesting "employee information," and a "HER Imports Mobile iPhone Agreement."[11] Id. Plaintiff submitted copies of *some* of the till summary receipts that show the amount plaintiff paid herself, and others, without delineation of how many hours plaintiff was paying herself for, or what, if any, money she took was reimbursement for costs of promoting the business. Blit. Decl. Exh. 2. Plaintiff also submitted "time sheets" spanning May through December 2014, without indicating who prepared these documents. Furthermore, the Court finds it difficult to credit Cronister's testimony that all other retail store staff were considered employees, but "plaintiff sort of did her own thing." Cronister Dep. 29:1-2. All other retail staff were employees and all staff at the retail store locations did the same job: they sold HER Imports brand products. Therefore, defendants' assertion that plaintiff was not an employee is specious. Just because defendants inherited the arrangement that Terry made with

---

[10] This was the same month that HER Imports, LLC and EZJR entered into the Marketing & Selling Agreement.
[11] Plaintiff testified that Terry gave her a work cell phone when he visited Brooklyn for the first time after she was hired. Plt. 56.1 ¶ 51; Plt. Dep. 19:12-13; 28:14-15. Notably, defendants take exception to this fact on the grounds that plaintiff testified that she kept the contact information of stylists on her personal cell phone. Deft. 56.1 ¶ 51.

plaintiff does not change the nature of plaintiff's job as retail staff. Defendants cannot count on the informality of the arrangement to deny plaintiff wages if she was an employee.

Beyond the degree of control that defendants asserted over plaintiff, the <u>Superior Care</u> factors weigh whether plaintiff had an opportunity to invest in the business, the "degree of skill and independent initiative needed to perform the work," the "permanence or duration of the working relationship," and "the extent to which the work is an integral part of the employer's business." As to investment in the company, Terry testified that their original agreement was to split the profits of whatever plaintiff sold. However, that arrangement soon changed when plaintiff asked to be paid hourly because she was not making enough commission. Terry Dep. 18:11-17. Terry and plaintiff both testified that he trained plaintiff on one of his trips to New York, thus demonstrating that plaintiff did not need a special skill set in order to be hired. However, she appears to have been left to her own devices to set up and open the store and to promote the brand generally. Plaintiff only worked for HER Imports for approximately 20 months. However, it appears that during that time she built a relationship with Terry, Reid, and Cronister. Plt. Dep. 74:15-20. While a short employment relationship generally weighs in favor of finding that plaintiff was an independent contractor, here, there is no record evidence that she was hired for a short-term position. Plaintiff resigned because she was not being paid. <u>Id.</u> 37:21-23; 74:18-20.

The test for whether plaintiff was an employee or an independent contractor relies on facts that are in dispute; therefore, plaintiff's motion for summary judgment on this ground should be denied. "The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law." <u>Superior Care</u>, 840 F.2d at 1059. "Such questions are regularly presented to juries that are instructed to return general verdicts, informed by the court's instructions on the law and given the direction that if they find that the plaintiffs in question were employees (and find all of the other

elements of the plaintiffs' claims proven), they should simply state that they find in favor of the plaintiffs." Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 171 (2d Cir. 1998) (the district court did not err in submitting the question of whether plaintiff was an employee to the jury). Accordingly, upon careful review of the parties' conflicting testimony, the Court should deny plaintiff's motion for summary judgment regarding whether plaintiff was an "employee" under the FLSA.[12]

### EZJR AND HER HOLDING OPERATED AS "EMPLOYERS" WITH HER IMPORTS

### I.   The Agreements Between HER Imports, EZJR, and HER Holding

   *a.   October 2014: The Marketing Agreement between HER Imports and EZJR*

In July 2013 when Terry hired plaintiff, HER Imports NY, LLC and HER Imports, LLC were running the business. HER Holding was not yet created and HER Imports had not yet contracted with EZJR. On October 1, 2014, HER Imports entered into a "Marketing and Selling Agreement" with EZJR.[13] Def. 56.1 Stmt. ¶ 12. EZJR is incorporated and based in Las Vegas, Nevada. Def. 56.1 ¶ 3. Barry Hall is the Executive Chairman of the corporation.[14] Def. 56.1 ¶ 9. EZJR is "in the business of improving the sales performance of brands, products and services by way of its proprietary eCommerce platform." Def. 56.1 ¶ 15.[15] During his deposition, Hall explained that the eCommerce platform is also "referred to as a CRM, which is a customer relations manager. It's software that we use to manage online sales and to market to our customers in various ways; test the results of that marketing; see how it all works. That's really our business." Id. The Marketing and Selling Agreement ("Agreement") reads:

---

[12] "It is also noteworthy, that as of 2014, 'there appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA, but not the NYLL (or vice versa).'" Mahoney, 14 CV 4131 (ENV)(VMS), 2016 WL 6585810 (E.D.N.Y. Sept. 30, 2016) (internal citations omitted), report and recommendation adopted in full, 2016 WL 6601445 (E.D.N.Y. Nov. 7, 2016).

[13] The Agreement has since been modified three times: on November 14, 2014 (ECF No. 58, Exh. D); on August 28, 2015 (ECF No. 58, Exh. E); and on October 13, 2015 (ECF No. 58, Exh. F). Def. 56.1 Stmt. ¶¶ 27, 38, 39.

[14] Hall was designated as the 30(b)(6) witness for EZJR.

[15] Plaintiff admits to this fact; however objects to the characterization of EZJR's business, which plaintiff maintains is more than what defendants describe in paragraph 15 of Defendants' 56.1 Statement.

> WHEREAS EZJR is in the business of improving sales performance of brands, products and services by way of its proprietary eCommerce platform; and WHEREAS Her desires to have EZJR market and sell certain products heretofore offered for sale by Her; and WHEREAS the parties have come to an agreement for EZJR to purchase, market and sell Her's products while Her maintains physical locations and provides customer service before, during and after the sale for which Her will be reimbursed for overhead and services and will receive a royalty on all sales.

Hall Decl., ECF No. 58, Exh. A. The Agreement explicitly delineates the responsibilities of each entity.[16]

Pursuant to the Agreement, EZJR purchased "all inventory on hand as of October 1, 2014" from HER Imports. Agreement ¶ 5. All of the inventory sold from that date on, "will be the property of EZJR" and EZJR bore the risk of inventory. Id. ¶ 2.1. EZJR was responsible for all marketing, including online marketing, branding, promotion, and traditional advertising. Id. ¶ 2.2. EZJR was also responsible for establishing the merchant accounts and providing the Point of Sale ("POS") equipment to process sales, as well as handling online sales and fulfillment. Id. ¶ 2.3. Under the contract, EZJR could perform certain administrative tasks for HER Imports, which HER Imports would then reimburse for actual cost and a five percent overhead fee. Id. ¶ 2.4.

HER Imports was responsible for leasing and maintaining physical sales locations "in a matter consistent with the brand image created by EZJR…." Agreement ¶ 3. HER Imports was also responsible for staffing each location and promoting sales through both store and field promotion. Id. ¶¶ 3.2, 3.3. EZJR was responsible for reimbursing HER Imports for overhead fees, plus a five percent "administrative fee."[17] Id. ¶ 4.1. HER Imports was to continue developing and sourcing the product that EZJR bought and sold, however, with the "involvement and approval of EZJR." Id. ¶ 3.4. HER Imports was required to equip each store with "telephon[e] and [internet] connectivity to allow the proper function and communication of the POS terminal." Id. ¶ 3.6.

---

[16] Upon executing a new agreement in November 28, 2016, EZJR terminated the Agreement. Deft. Counter-Stmt. ¶ 165. Thus, I refer to the parties' responsibilities under the Agreement in the past tense.

[17] Barry Hall testified that all employee and sales rep fees were the ultimate responsibility of EZJR. Hall Dep. 39.

HER Imports agreed to pay EZJR $500,000 in set up fees for the "integration of Her's system into EZJR eCommerce platform and the initial development and execution of a market plan . . . ." Agreement ¶ 6. EZJR agreed to pay HER Imports ten percent (10%) of the gross sales in royalties each month.[18] Id. ¶ 4.2 The Agreement requires both corporations to report certain data to the other; HER Imports was to report the inventory on hand and any information pertaining to customer sourcing and satisfaction to EZJR, while EZJR was to report gross revenues and the calculation of monthly royalty payments to HER Imports. Id. ¶¶ 3.5, 4.3. Under the original agreement, HER Imports may audit EZJR in order to verify the accuracy of the royalty payments. Agreement ¶ 4.6. EZJR could not assign the agreement to any other party. Id. ¶ 11. Finally, the Agreement stated that

> the parties are acting at all times as independent entities and nothing contained in this Agreement shall be construed or implied to create an agency, partnership or employer and employee relationship between any of the parties. Except as specifically provided herein, at no time shall either party make commitments or incur any charges or expenses for or in the name of any other party. Id. ¶ 12.3.

Soon after the Agreement was signed, EZJR assumed many of the responsibilities assigned to HER Imports. The Agreement was soon amended to reflect these changes.[19] For example, the second amendment to the Agreement reduced the amount of royalties that HER Imports received to account for the additional responsibilities EZJR assumed that were originally assigned to HER Imports under the original Agreement.

---

[18] "Gross Sales" is defined under the agreement as the "amount received on account of products sold or otherwise distributed by EZJR" less "sales tax, freight and transportation charges, custom duties, insurance, rebates and retroactive price reductions, commissions actually paid to distributors and sales representatives." Agreement ¶ 4.2. The second amendment to the Agreement executed on August 28, 2015, reduced the royalties to two-and-a-half percent (2.5%) of gross revenues. ECF No. 58, Exh. D ("Amendment #1") ¶ 1.1.

[19] Pursuant to the November 14, 2014 amendment, the parties agreed that EZJR could offset its payments to HER Imports by whatever HER Imports may owe EZJR at the end of each month. Amendment #1 ¶1.1. Under the amendment, EZJR would provide HER Imports with an additional report outlining the monthly offset amounts. Id. ¶ 1.2. Under the August 28, 2015 amendment, the amount EZJR owes to HER Imports in royalties was reduced to two-and-a-half percent (2.5%). Hall Decl., Exh. E ("Amendment #2") ¶ 1.1. In return for the reduction in royalties, EZJR became responsible for "all costs associated with customer service," and "all telephon[e] and connectivity costs incurred at physical Her store locations." Id. ¶ 2. By amendment dated October 13, 2015, EZJR agreed to enforce any and all trademark infringement of HER Imports brand. ECF No. 58, Exh. F ("Amendment #3") ¶ 13.

   b.  *March 2015: HER Holding, Inc, is Incorporated and HER Imports Assigns Its Rights and Responsibilities Under the Agreement with EZJR to HER Holding*

On March 6, 2015, Hall incorporated the company HER Holding. ECF No. 60, Exh. L. The articles of incorporation name Cronister as President, Treasurer, and Director; Reid as the Secretary; and Hall as the Registered Agent for Service of Process. Id. On March 7, 2015, HER Holding and HER Imports entered into an "Assignment and Assumption Agreement," ("Assignment") whereby "[HER Holding] assumes all of [HER Imports] rights, title, interest, obligations, responsibilities, and duties in and under the Agreement to the same extent as though it has originally been a party thereto." Def. 56.1 Stmt. ¶¶ 33, 34. Paragraph two of the Assignment states, "[HER Holding] agrees to observe, perform, and fulfill the terms and conditions of the Agreement to the same extent as though it had originally been a party thereto." Def. 56.1 ¶ 34. Should the terms of the Agreement conflict with the Assignment, "the Assignment shall govern."[20] Hall Decl., Exh. G, ¶ 4. Reid signed on behalf of HER Imports, LLC, Cronister signed on behalf of HER Holding, and Hall signed providing EZJR's consent to the Assignment. Id.

During his deposition, Cronister testified that HER Holding was created solely as a repository for the royalty payments that EZJR owed HER Imports under the Agreement. Cronister Dep. 31:8-10. Cronister further stated that he uses the money deposited into HER Holding's account to reinvest in HER Imports store locations he manages as needed and to continue promoting the HER Imports' brand. Cronister Dep. 33:23-34:3.

---

[20] Paragraph six of the Assignment relates to indemnification. Under this provision, HER Holding agreed to indemnify both HER Imports, LLC and EZJR from any liability arising under the Agreement from March 7, 2015 forward. Id. ¶ 6.a. & 6.c. HER Imports agreed to indemnify both HER Holding and EZJR from any liability arising from the Agreement prior to March 7, 2015. Id. ¶ 6.b. & 6.d. Questions relating to indemnification between the named defendants are not at issue in the instant motion as "[t]here is no right of contribution or indemnification for employers found liable under the FLSA." Herman v. RSR Sec. Services Ltd., 172 F.3d 132, 144 (2d Cir. 1999). The Court acknowledges the Agreement's indemnification provision to explain the relationship between the defendants.

## II.  The Moving Defendants are "Employers" Under the FLSA

Defendants maintain that neither HER Holding nor EZJR ever employed plaintiff. Defendants move for summary judgment on the grounds that: (1)  HER Holding cannot be held liable under a theory that it is a single integrated enterprise with HER Imports, and (2) EZJR cannot be held liable on the theory that it operates either as a single integrated employer or joint employer with HER Imports under the FLSA. Plaintiff cross-moves for summary judgment on the ground that both HER Holding and EZJR employed plaintiff within the meaning of the FLSA. Notably, neither HER Holding nor EZJR can be held liable for plaintiff's wage and hour claims if plaintiff does not establish that she was an "employee" within the meaning of the FLSA. Having found that material issues of fact are in dispute regarding whether plaintiff was an "employee" or an "independent contractor," defendants' status as employers will only be relevant if the jury finds plaintiff was an "employee." Nevertheless, as the parties' cross-motions strongly dispute whether the moving defendants are "employers" under the FLSA, I address the issues below.

The FLSA contemplates that an individual may be employed by more than one entity. Zheng v. Liberty Apparel Co. Inc., 355 F.3d 61, 66 (2d Cir. 2003); See 29 C.F.R. § 791.2(a). There are two principle theories under which multiple entities may be found to be jointly liable for violations of labor laws: "single integrated enterprise" and "joint employer." The theories are mutually exclusive. See Arcuelo v. On-Site Sales & Marketing, LLC, 425 F.3d 193, 198 (2d Cir. 2005) ("In a joint employer relationship, in contrast, there is no single integrated enterprise. A conclusion that employers are joint assumes that they are separate legal entities, but that they handle certain aspects of their employer-employee relationship jointly." (internal citations and alterations omitted)). As HER Holding and EZJR move for summary judgment on different theories, I address each entities' putative "employer" status separately.

19

### a.   HER Holding is a Single Integrated Employer with HER Imports

Defendant HER Holding moves for summary judgment on the basis that it is not a single integrated enterprise with HER Imports, LLC. "To prevail in an employment action against a defendant who is not the plaintiff's direct employer, the plaintiff must establish that the defendant is part of an 'integrated enterprise' with the employer, thus making one liable for the illegal acts of the other." Parker v. Columbia Pictures Indus., 204 F.3d 326, 341 (2d Cir. 2000) (internal citations omitted). "A 'single employer' situation exists 'where two nominally separate entities are actually part of a single integrated enterprise.'" Arcuelo, 425 F.3d at 198 (quoting Clinton's Ditch Cooperative Co. v. NLRB, 778 F.2d 132, 137 (2d Cir. 1985) (two separate corporations under common ownership and management may be deemed to constitute a single enterprise)). The most common example of a single integrated employer is between "parent and wholly-owned subsidiary corporations, or separate corporations under common ownership and management" that operate as a "single enterprise." Id. at 198 (citing Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240-41 (2d Cir. 1995). Under the four-part test adopted by the Second Circuit, the Court must consider whether two companies exist with: "(1) [an] interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." Id.

These factors focus on the relationship between the two entities, and not on the individual plaintiff's employee status. Thus, determining whether HER Holding constitutes a single integrated enterprise with HER Imports does not conflict with the Court's finding that plaintiff must still establish that she was an employee for the purposes of the FLSA. If plaintiff was an employee and HER Holding is found to be a single integrated employer, HER Holding will be liable under the FLSA for any wage and hour claims that plaintiff may prove. "[N]o one factor is determinative…[however,] control of labor relations is the central concern." Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996) (citations omitted).

Defendants argue that because HER Holding was not formed until the same month that plaintiff resigned, it cannot be considered a single integrated enterprise or joint employer for the purposes of the FLSA. Defendants cite to a Northern District of New York case, Bricklayers and Allied Craftworkers Local 2 v. C.G. Yantch, Inc., 316 F.Supp.2d 130, 143 (N.D.N.Y. 2003), for the proposition that the "single employer doctrine generally applies where the entities *concurrently* perform the same function and one entity recognizes the union and the other does not." (*italics in original*). Def. Memo, ECF No. 61. Whether an entity constitutes a single integrated enterprise is a fact-specific inquiry into the circumstances of the case as they relate to the factors above. In Bricklayers, plaintiffs sought delinquent benefit contributions under ERISA. There, the defendant corporation that was a signatory to the CBA dissolved after the President created a new corporation. The new corporation had the exact same ownership and management, used the same facilities, and performed the same trade. The two entities existed simultaneously for two months, however, at the time of the lawsuit, only the latter corporation existed. The Court found, that even though the two entities did not operate concurrently at the time of the alleged delinquency, they were nevertheless a single integrated enterprise.

Far from serving as support for defendants' argument, Bricklayers supports a finding that HER Holding is a single integrated employer with HER Imports. Regardless of the fact that HER Holding was incorporated the same month that plaintiff resigned, HER Holding and HER Imports entered into the Assignment, whereby HER Holding assumed HER Imports' obligations under the Agreement with EZJR, which includes staffing the retail locations. HER Holding was simply an extension of HER Imports that could receive royalties following the Assignment. Just as in Bricklayers, the management, facilities, and trade that the two entities used remained the same.

As to the second and third factors relating to centralized control and common management, HER Holding and HER Imports share common management. Jerome Reid owned the HER Imports

brand, while Patrick Terry, who founded the company and was the owner and operator of HER Imports' worldwide operations, was in charge of marketing. Def. Counter-Stmt. ¶ 105. Both Terry and Reid made management decisions for HER Imports. Id. HER Imports hired Cronister and soon after promoted him to national manager for the domestic retail store. Def. 56.1 ¶ 7. Cronister is the President of HER Holding Def. 56.1 ¶ 8. As Cronister is both national manager for HER Imports and the President of HER Holding, there is no apparent distinction in the operation of HER Imports and HER Holding. Cronister was in charge of managing the HER Imports retails stores, both before and after HER holding was incorporated, controlling the operations in the same manner both as the national manager of HER Imports and the President of HER Holding. Cronister testified that he operates with autonomy to open and close retail store locations, hire and train staff at the various locations, and determine compensation.

Finally, Cronister's financial control over the domestic retail locations both as the national manager of HER Imports and as President of HER Holding is significant. Cronister uses the royalties paid to HER Holding under the Assignment to reinvest in HER Imports' retail locations, paying for promotional materials, marketing, and store-related expenses. Def. Counter-Stmt. ¶ 110; Cronister Dep. 26:23-27:5; 28:4-7. Thus, Cronister remains a central manager with financial control of both companies. Cronister testified that HER Holding was incorporated for the sole purpose of receiving royalties that EZJR was required to pay to HER Imports under their Agreement after HER Imports' bank account was frozen in March 2015. Cronister Dep. 27:9-28:2.

The record clearly demonstrates that HER Holding was created as an extension of HER Imports, retaining common management, centralized control of labor operations, and financial control. Accordingly, the Court should find that HER Holding is a single integrated employer with HER Imports and defendants' motion for summary judgment on this issue should be denied.

### b.  EZJR and HER Imports are Joint Employers

Defendant EZJR moves for summary judgment on the basis that it is not a joint employer with HER Imports and HER Holding. "Federal regulations and the Second Circuit recognize the possibility of joint employment for purposes of determining FLSA responsibilities." Godlewska v. HAD, 916 F.Supp.2d 246, 257 (E.D.N.Y. 2013) (citing 29 C.F.R. § 791.2(a) and Zheng, 355 F.3d at 66). An employee may be directly employed by one entity while being required to work in "circumstances that justify the conclusion that the employee is at the same time constructively employed" by another separate legal entity. Arcuelo, 425 F.3d at 198. Where an entity does not have formal control over an employee, it may nevertheless be liable for violations under the FLSA, where the entity "exerts sufficient control to qualify as a joint employer under the FLSA." Cano v. DPNY, Inc., 287 F.R.D. 251, 258 (S.D.N.Y. 2012) (quoting Jean-Louis v. Metropolitan Cable Commc'ns, Inc., 838 F.Supp.2d 111, 121 (S.D.N.Y. 2011)). Joint employers are "responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek." Godlewska, 916 F.Supp.2d at 257 (quoting 29 C.F.R. § 791.2(a)). Recognizing that there are various forms of control, courts in this circuit apply both a "formal control test" and a "functional control test" when determining whether an entity operated as a joint employer. See Zheng, 355 F.3d at 69 ("In our view, the broad language of the FLSA [ ] demands that a district court look beyond an entity's formal right to control the physical performance of another's work before declaring that the entity is not an employer under the FLSA."). "In deciding whether an entity is a joint employer, 'different sets of relevant factors' apply, 'based on the factual challenges posed by particular cases.'" Cano, 287 F.R.D. at 258 (quoting Barfied v. New York City Health and Hosp. Corp., 537 F.3d 132, 142 (2d Cir. 2008)).

i.  *Formal Control Test*

Like the employee/independent contractor test, here too, the test to determine whether an entity is a joint employer under the FLSA is "grounded in 'economic reality rather than technical concepts.'" <u>Zheng</u>, 355 F.3d at 66 (quoting <u>Goldberg v. Whitaker House Co-op.</u>, Inc. 366 U.S. 28, 31 (1961)). To determine whether an entity has "formal control" over an employee, the Court asks whether it: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." <u>Carter v. Dutchess Community College</u>, 735 F.2d 8, 12 (2d Cir. 1984) (quoting <u>Bonnette v. California Health and Welfare Agency</u>, 704 F.2d 1465, 1470 (9th Cir. 1983)). "No single factor of the test is dispositive, and the Court's determination is to be based at all times on the totality of the circumstances." <u>Chen v. DG&S NY, Inc.</u>, 14-CV-3435 (LDH)(RLM), 2016 WL 5678543, at *3 (E.D.N.Y. Sept. 29, 2016).

As to the first factor, it is undisputed that HER Imports, and not EZJR, had the power to hire and fire employees. Patrick Terry hired plaintiff and, at the time plaintiff submitted her resignation, Cronister was in charge of hiring as HER Imports national manager. Def. Counter-Stmt. ¶ 144; Cronister Dep. 28:4-7. Cronister testified that it was his job to hire and fire the staff employed at the retail store locations. Cronister Dep. 28:4-7. Similarly, with regards to the second factor, HER Imports and HER Holding appear to have retained primary control over supervising the retail locations. Plaintiff never met or spoke to Hall directly. Plt. Dep. 68:14-22. Cronister was in charge of managing and supervising the retail staff in all domestic store locations for HER Imports and HER Holding. Def. 56.1 ¶ 7; Plt. 56.1 ¶ 99.

The parties contradict each other regarding which entity determined the rate and method of pay. It is unclear whether EZJR, through Hall, had any real authority to determine the rate and method of pay, though EZJR clearly affected the method of payment. Plt. 56.1 ¶ 75; Def. Counter-Stmt. ¶ 75.

Plaintiff's rate of pay was set by Terry soon after she was hired. After that, Georgette notified plaintiff regarding any increase or decrease in her hourly wage. In October of 2014, around the time that EZJR and HER Imports entered into the first agreement, plaintiff's hourly rate was decreased from $20.00 to $17.50 per hour. Plt. 56.1 ¶ 94. Plaintiff was no longer allowed to pay herself from the till and Georgette began to pay plaintiff by check. Def. Counter-Stmt. ¶¶ 122, 123. Georgette stopped working at HER Imports in December 2014 and plaintiff complained that she stopped receiving compensation when Georgette left. Id. ¶ 124.

Hall testified that after the Agreement between HER Imports and EZJR was signed, he would direct his assistant to provide payroll services to HER Imports as a "minor favor" (taking no more than two hours per week). Hall Dep. 43:21-44:6. Hall testified that ADP, and not EZJR, formally handled HER Imports' payroll. Id. 43:13. In January 2015, Plaintiff complained to Terry and Cronister than she had not been paid in months. Def. Counter-Stmt. ¶¶ 124, 125. Cronister told her to email Barry Hall of EZJR, which she did. Def. 56.1 ¶ 28. At the request of HER Imports, Barry Hall deposited $5,000 into plaintiff's niece's Bank of America account. Def. 56.1 ¶ 29. Plaintiff resigned from HER Imports in March 2015. Plt. 56.1 ¶ 95.

Cronister explained that most retail staff started out at $14.00 per hour, which increased by approximately $2.00 per hour for an employee whose store was performing particularly well. Cronister Dep. 17:3-12. Both Hall and Cronister testified that Hall would object only if HER Imports decided to pay an employee an amount that would be unreasonable under the Agreement. Hall Dep. 64:12-23; Cronister Dep. 15:17-16:6. However, when prompted, Cronister testified that Barry Hall, of EZJR, is the person to ask about payroll. Cronister Dep. 22:5-6. When asked if there was *anyone from HER Imports* to discuss payroll with, Cronister said "Barry Hall." Id. 22:2-23:6. Thus, while Hall and EZJR did not exclusively control the rate of pay and the method of compensation, HER Imports was expected to clear with EZJR any changes made to their employees' hourly rates.

Finally, the evidence regarding plaintiff's employment records is woefully incomplete. HER Holding and EZJR admit that they have not kept wage and hour records for plaintiff, but maintain neither is legally obligated to do so. Def. Counter-Stmt. ¶¶ 55, 56. The only records relating to plaintiff's employment that have been produced to the Court are photographs of checks Georgette issued to plaintiff towards the end of 2014, a one-page payroll report listing the same four checks, unidentified time records for plaintiff from May through December 2014, and some of the "till summary receipts" from the Brooklyn store. Blit. Decl. Exh. 2. Defendants submit that plaintiff never completed the personnel forms that Georgette sent to her. Def. Counter-Stmt. ¶ 127.

The facts pertaining to EZJR's formal control of plaintiff's employment are disputed such that, even viewing the evidence in the light most favorable to the plaintiff, the Court cannot conclude that EZJR is a joint employer under the "formal control test" articulated in Carter. However, the Court must still consider whether EZJR functionally controlled plaintiff's employment, thereby operating as plaintiff's joint employer.

*ii. Functional Control Test*

The Second Circuit applies a six-part test to determine whether an entity has "functional control over workers even in the absence of the formal control measured by the Carter factors." Zheng, 355 F.3d at 68. The relevant factors include:

> (1) whether the purported joint employer's premises and equipment were used for the plaintiff['s] work; (2) whether plaintiff [worked] for an organization that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiff[] performed a discrete line job that was integral to the purported joint employer's process of production; (4) whether responsibility under the contracts could pass from one [purported joint employer] to another without material changes; (5) the degree to which the purported joint employer supervised plaintiff['s] work; and (6) whether plaintiff[] worked exclusively or predominantly for the purported joint employer.

Godlewska, 916 F.Supp.2d at 257 (citing Zheng, 355 F.3d at 72). "[W]hen [the factors] weigh in plaintiff's favor, they indicate that an entity has functional control over workers even in the absence

of the formal control measured by the <u>Carter</u> factors." <u>Zheng</u>, 355 F.3d at 72. This test serves to determine whether an employer "has outsourced work in name only," but remains functionally in control of an employee. <u>Jean-Louis</u>, 838 F.Supp.2d at 121.

When asked why HER Imports entered into the Agreement with EZJR, Terry testified, "EZJR wanted to leverage a brand name that it was just too much of a headache to operate and we were going to walk on. They said no, no, no wait, we can make money off of this thing. So that was it, go and try to make money off the brand name." Terry Dep. 44:16-21. When asked how his role changed after EZJR became engaged in the business, Terry testified, "[w]ell now they owned it essentially, or they owned the hopes of producing revenue." <u>Id.</u> 48:8-10. When asked who was responsible for the employees, Terry explained, "[t]he employees at that point working getting paid would be a mix of Dave and Barry. Barry would make sure they would get paid and Dave would make sure they were showing up on time."[21] <u>Id.</u> 55:2-6. After HER Imports accounts froze, Terry testified that current HER Imports staff were "grandfathered into EZJR" for the purposes of being paid. <u>Id.</u> 56:15-18. Terry further explained that after the Agreement was entered and HER Holding was formed, the retail locations were "managed and operated in some mix between EZJR and HER Holding," <u>Id.</u> 60:12-20, but it was "probably HER Holding more than EZJR." <u>Id.</u> 65:11-12.

EZJR owned the equipment used and products sold in HER Imports' retail stores beginning October 1, 2014. EZJR purchased all of HER Imports products as of October 1, 2014, and used both the retail store locations and their eCommerce platform to sell and promote the HER Imports brand products. Agreement ¶ 2.1. EZJR also equipped all domestic retail stores with the POS equipment used to record sales. Agreement ¶ 2.3. Thus, any hours plaintiff worked from October 1, 2014 onward were spent selling EZJR's property and using EZJR's equipment to do so. This serves to satisfy the first and third <u>Zheng</u> factors, establishing that EZJR premises and equipment were used for plaintiff's

---

[21] "Dave" refers to David Cronister, and "Barry" refers to Barry Hall.

work and plaintiff performed a line job that was integral to EZJR's business from October 1, 2014 until plaintiff resigned in March 2015.

As to the second factor, the record establishes that the business shifted somewhat seamlessly between EZJR and HER Imports, despite the more formal responsibilities outlined in the Agreement. Under the Agreement as it existed when plaintiff was employed, HER Imports was responsible for leasing and staffing the physical store locations where EZJR's purchased products were sold and promoted. Agreement ¶ 3.1. However, Hall testified that shortly after the Agreement was signed, EZJR began paying the rent on the leased premises directly, rather than reimbursing HER Imports as part of the overhead costs accounted for in the Agreement, because HER Imports was not paying those rents on time. Hall Dep. 40:17-41:14. EZJR was also responsible for reimbursing HER Imports for overhead costs, which included the costs of staffing the stores. In addition to paying rents directly, it is clear from Terry, Cronister, and Hall's testimonies that when HER Imports had any issue with payroll, the business turned to Hall of EZJR to assist. Hall Dep. 42:1-16; Cronister Dep. 22:2-6; Terry Dep. 55:2-6. Hall referred to providing payroll services as a "minor favor" to HER Imports.[22] Hall Dep. 44:5-6. Still, it was one part of the larger operations required to keep the business running.

Under the Agreement, EZJR controlled the revenue of HER Imports retail locations and owned all of the product sold in stores. Agreement ¶ 3. Cronister used the royalties that EZJR paid out to reinvest in the retail store locations to pay for promotions, marketing and store-related expenses. Def. Counter-Stmt. ¶ 110. When HER Imports encountered difficulty in wiring plaintiff money in early 2015, they asked EZJR to pay her. Def. 56.1 ¶ 29. Defendants argue that they did not control the method or amount of plaintiff's pay, as evidenced by the fact that the one time they paid plaintiff,

---

[22] Defendants rely on the decision in <u>Reiseck v. Universal Communications of Miami</u>, No. 06 Civ. 0777 (TPG), 2012 WL 3642375, *16-17 (S.D.N.Y. Aug. 23, 2012), to support their argument that EZJR's "favor" in providing payroll services does not militate toward finding that EZJR was a joint employer. In that case, the named individual accountant was not held liable because he only paid the plaintiff's compensation on the terms set by the corporation. However, the Court denied the corporation's motion for summary judgment on the issue of joint employer finding that "the considerable integration of the two companies casts doubt on [defendant's] alleged independence."

they only did so at HER Imports' request and immediately counted it as an offset to the next royalties payment. However, the Agreement requires that EZJR reimburse HER Imports for overhead costs. Agreement ¶ 4.1. The fact that EZJR counted the $5,000 as an offset to the royalty payment supports plaintiff's position that EZJR was ultimately responsible for compensating HER Imports staff. Furthermore, the Court notes that plaintiff's method of pay changed—from paying herself out of the cash register to receiving checks—at approximately the same time the Agreement between HER Imports and EZJR was signed in October 2014. Def. Counter-Stmt. ¶ 123.

During his deposition, Hall described the business of selling HER Imports brand products: when and how store locations are opened, stocked with inventory, and staffed. Hall's use of "we" throughout his testimony to describe those making the decisions is telling. Hall Dep. 28:1-24. When asked if HER Imports could open a physical store location to sell hair without EZJR approval, Hall responded, "I don't believe they could. I'd have strong objections to that in the United States." Id. 35:11-16. Furthermore, under the Agreement, EZJR was in control of the gross revenues. Agreement ¶ 4.3 It is clear from the record before the Court that EZJR, HER Imports, and HER Holding were firmly tied together; one could not conduct business without the other.[23]

The first four factors above relate to the continuity of the operations and business relationship between HER Imports and EZJR. Whereas, the fifth and sixth factors relate directly to EZJR's interaction with plaintiff and, here, weigh in support of defendants' position that EZJR was not a joint employer. Plaintiff testified that she never met or spoke to Hall. Def. 56.1 ¶ 37. She sent him one

---

[23] Defendants rely on the decisions in Hugee v. SJC Group, Inc., No. 13 Civ. 0423 (GBD), 2013 WL 4399226, *15-17 (S.D.N.Y. Aug. 14, 2013) and Jean-Louis, 838 F.Supp.2d at 136-37, to analogize the employment relationship here, to the subcontractor/contractor relationship in those cases. In Hugee, defendant subcontracted security services from another firm, and in Jean-Louis, TimeWarner entered into a subcontract with Metro Cable Company for cable technicians. In both cases, the contractor and subcontractor relationship was clearly delineated. The plaintiffs in each case were hired and controlled by the subcontractor company. For these cases to have any meaning here, EZJR would have had to have been the subcontractor hired solely to work on marketing and eCommerce. However, as the record makes clear, EZJR effectively took over running the larger business operations of HER Imports domestically, so much so that when the decision was made to create HER Holding, Inc., Barry Hall of EZJR incorporated the company himself.

email, to which he never responded, while plaintiff spoke to Terry, Reid, Cronister, and Georgette on a regular basis, Id.; Plt. Dep. 63-69. Still, "'an entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours or pay them.'" Cano, 287 F.R.D. at 258 (quoting Zheng, 355 F.3d at 70). "Nor does employer status 'require continuous monitoring of employees, looking over their shoulder at all times, or any sort of absolute control of one's employees. Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA." Id. (quoting Herman v. RSR Sec. Services Ltd., 172 F.3d 132, 139 (2d Cir. 1999)). Plaintiff did not work directly for Barry Hall, but in so far as EZJR relied on HER Imports staff to sell products in the retail store locations, her work was integral to EZJR's business.

Reviewing the Zheng factors, I find that EZJR operated as a joint employer, with HER Imports and HER Holding, functionally controlling those originally hired by HER Imports.[24] Accordingly, I respectfully recommend that the Court should deny defendants' motion for summary judgment and grant plaintiff's cross-motion for summary judgment in part finding that EZJR operated as a joint employer with HER Imports and HER Holding under the FLSA.

### c. EZJR, HER Imports, and the Substantial Continuity Test

Even if EZJR was not found to be a joint employer under the FLSA, there is ample evidence in the record that suggests EZJR is a substantial continuity of HER Imports. In her cross-motion for summary judgment, plaintiff asks that the Court find as a matter of law that EZJR is a substantial continuity of the HER Imports companies. Under the "substantial continuity" test, "a company that

---

[24] I need not address defendants' argument that EZJR was not a single integrated enterprise, as an entity cannot be both. See Arcuelo, 425 F.3d at 198 (2d Cir. 2005) ("In a joint employer relationship, in contrast, there is no single integrated enterprise. A conclusion that employers are joint assumes that they are separate legal entities, but that they handle certain aspects of their employer-employee relationship jointly." (internal citations and alterations omitted)). Nevertheless, I note that defendants argue that because EZJR submits Form 10-K to the Securities and Exchange Commission for audit each year, but did not include the financials of HER Imports for the fiscal year ending on December 31, 2014, See ECF No. 58, Exh. C, they clearly are separate entities and cannot be found to be a single integrated employer. That may be so, but separate entities may still be held jointly liable as joint employers under the FLSA.

purchases another company's assets may be liable as a successor if there was 'substantial continuity' between the enterprises." Battino v. Cornelia Fifth Avenue, LLC, 861 F.Supp.2d 392, 401 (S.D.N.Y. 2012) (quoting Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 43 (1987)). The Second Circuit has yet to determine whether this test applies in the context of FLSA, although, the District Court for the Southern District of New York has applied the test on three occasions finding it to be the "logical extension of existing case law." Bautista v. Beyond Thai Kitchen, Inc., 14 Civ. 4335 (LGS), 2015 WL 5459737, at *3 (S.D.N.Y. Sept. 17, 2015) (internal quotations and citations omitted). The theory provides a basis for liability under the FLSA where a purchasing company acquires the assets of another company, but "is not liable for the seller's liabilities" under the common law test for successor liability. Battino, 861 F.Supp.2d at 400-01. Here, there is a substantial and continuous connection between the four named defendants, more so than the connection in those cases where the Courts have applied the "substantial continuity" test. Still, whether EZJR assumed HER Imports liability is disputed. As plaintiff's motion has raised the question of "substantial continuity" and EZJR now owns the HER Imports brand and formally operates as HER Imports, the Court addresses plaintiff's argument.

Under the test to determine whether EZJR is a "substantial continuity" of HER Imports, the Court must consider:

> (1) whether [EZJR] had notice of the charge or pending lawsuit prior to acquiring the business assets of [HER Imports]; (2) the ability of [HER Imports] to provide relief; (3) continuity of business operations; (4) whether [EZJR] uses the same plant; (5) whether [EZJR] uses the same or substantially the same work force; (6) whether the same jobs exist under substantially the same working conditions; (7) whether [EZJR] uses the same or substantially the same supervisory personnel; (8) whether [EZJR] uses the same machinery, equipment, and methods of production; and (9) whether [EZJR] produces the same product.

Bautista, 14 Civ. 4335, 2015 WL 5459737, at *5 (S.D.N.Y. 2015) (quotations omitted). Notably, the courts applying the "substantial continuity" test are not in agreement whether this is a question for the Court or the jury. "Several district court decisions treat it as a question for the jury." Id. at *4.

In their opposition to plaintiff's motion for summary judgment and their reply in support of their motion for summary judgment, defendants notify the Court for the first time that EZJR made a number of business decisions, beginning in April 2015, that altered its relationship to HER Imports, HER Holding, and the HER Imports brand.[25] EZJR incorporated Her Marketing Concepts, Inc. in April 2015. Def. Counter-Stmt. ¶ 163.  On November 28, 2016, EZJR terminated the Agreement with HER Holding, and entered into an Asset Share Purchase & Business Agreement ("Purchase & Business Agreement") with a company named Cabello Real Ltd. to acquire "the exclusive U.S. rights to the Her Imports trademark." Id. ¶¶ 164, 165. Under the terms of the Purchase & Business Agreement, *EZJR assumed all of HER Imports and HER Holding's location leases and hired all of HER Imports' staff.* Id. ¶ 166. On January 12, 2017, *EZJR officially changed its name to Her Imports*. Id. ¶ 168.[26] Since entering into the Purchase & Business Agreement and acquiring the domestic rights to the HER Imports brand, EZJR has expanded its operations in the United States, including leasing and staffing a dozen new retail locations. Id. ¶ 171.

To determine whether one entity is a "substantial continuity" of another entity often turns on facts that occur after the putative employee's employment ends. For example, in Bautista, even though plaintiff never worked for the defendant, defendant was found to be in substantial continuity with plaintiff's employer because defendant acquired the restaurant after plaintiff stopped working, but continued to run and manage the restaurant in the same manner and offered the same menu. The "substantial continuity" test aims to protect employees from employers who violate the FLSA and attempt to escape liability by "selling its assets without an assumption of liabilities by the buyer…and then dissolving." Bautista, No. 14 Civ. 4335, 2015 WL 5459737, at *4 (S.D.N.Y. 2015). Here,

---

[25] The facts relevant to EZJR's business with HER Imports since April 2015 can be found in Defendants' 56.1 Counter-Statement at paragraphs 163 through 181. Plaintiff denies ¶ 172 and ¶ 175, but otherwise admits to these facts, objecting only to their characterization as "material facts" as they occurred outside the timeframe relevant to plaintiff's FLSA claims. The Court notes that as the substantial continuity test is a test for successor liability, many material facts likely occur after the alleged wage and hour violations.

[26] The Court refers to this entity as EZJR for the purposes of this Report.

plaintiff may be similarly protected as she worked for one entity and when she sought compensation under the FLSA for unpaid wages, the defendants that hired her have defaulted and the defendants operating in the defaulted defendants' place claim they had nothing to do with plaintiff's employment.

Defendants argue that the first factor in the substantial continuity test is critical and it is the one plaintiff cannot meet. That is, defendants argue that because plaintiff was still working for HER Imports when EZJR signed the October 1, 2014 Agreement, EZJR did not have notice of plaintiff's claims. Defendants do not keep their story straight. The first factor depends on when the successor entity "acquires the business assets of the predecessor." For most of the motion, defendants argue that EZJR did not acquire HER Imports under the October 1, 2014 Agreement and remained a separate entity only engaged with HER Imports in an "arm's-length negotiation" for the purposes of a marketing contract. Now, they use that same October 1, 2014 date as the point of reference for the date the business assets were acquired to avoid the notice requirement. The corporate entities' October 1, 2014 Agreement makes it difficult to discern when the entities became one and the same on the domestic front, however October 1, 2014 is not the operative date for the substantial continuity test. The first factor in the "substantial continuity" test considers the date the successor assumed the predecessor's business assets. In this case, that would be the November 28, 2016 Purchase & Business Agreement. At the time that agreement was signed, there is no doubt that EZJR had actual notice of plaintiff's claims as this case was already pending.

As to the second factor, whether HER Imports can provide relief is unknown to the Court at this time because the two HER Imports defendants have defaulted. The third, fourth, and fifth factor are met here as EZJR, upon acquiring the domestic rights to the HER Imports brand, acquired the leases and staff for the retail stores already in place and continued operating the various HER Imports retail locations that were already up and running. Def. Counter-Stmt. ¶ 166. EZJR even changed its name to Her Imports. Id. ¶ 168. Furthermore, the retail locations continue to sell HER Imports

products, only recently adding new inventory to what those locations have always sold, satisfying the ninth factor. Id. ¶ 179.

EZJR states that its current employees are under a new employment management system (Professional Employment Organization ("PEO")), they have opened new locations, and the corporation uses new equipment to conduct sales. Id. ¶¶ 171, 173, 180. Despite defendants' argument that they have entirely revamped operations and their website, this does not mean that there was a break in the continuity of business operations; rather, it simply means that the business has grown since EZJR formally took over. Finally, EZJR maintains that it has an entirely new executive team. Id. ¶¶ 174, 175. Nevertheless, Barry Hall—who is listed as the Executive Chairman, Chief Executive Officer and Chief Financial Officer—is still steering the ship. Id. ¶ 181. Thus, I find that plaintiff satisfies the seventh factor relating to the same "supervisory personnel." ECF No. 67, Exh. M.

While it remains to be seen whether plaintiff can establish that she was an employee for the purposes of recovering under the FLSA, the record demonstrates that EZJR is a substantial continuity of HER Imports. Nevertheless, as this test has not yet been formally adopted by the Second Circuit and most courts that apply the test treat the factors discussed above as questions for the jury, the Court should not find that EZJR is a substantial continuity of HER Imports as a matter of law. At the very least, plaintiff has raised a triable issue of fact with regard to the substantial continuity of HER Imports and EZJR and she should be able to present her case to the jury on this issue. See Chen, No. 14-CV-3435 (LDH)(RLM), 2016 WL 5678543, at *5 (E.D.N.Y. Sept. 29, 2016) (finding on summary judgment that there was at least a triable issue of fact as to "substantial continuity," despite being unable to find as much as a matter of law because there was no evidence in the record that the successor entity had "expressly assumed" the operations of the predecessor). Accordingly, I respectfully recommend that plaintiff's motion for summary judgment regarding whether EZJR is a substantial continuity of HER Imports should be denied.

## PLAINTIFF'S WAGE & HOUR CLAIMS

### I.  Plaintiff's Minimum Wage and Overtime Claims Under the FLSA

Plaintiff cross-moves for summary judgment on the ground that defendants failed to pay her minimum wage and overtime compensation as required under the FLSA. "Under the FLSA, an employee seeking to recover unpaid minimum wages or overtime 'has the burden of proving that [s]he performed work for which [s]he was not properly compensated.'" Jiao v. Shi Ya Chen, No. 03 Civ. 0165 (DF), 2007 WL 4944767, at *2 (S.D.N.Y. Mar. 30, 2007) (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946)). "When an employer fails to comply with the FLSA's record-keeping requirements, however, . . . [t]he plaintiff is able to meet his initial burden under the statute by relying on his recollection alone." Id. (citations omitted). Plaintiff's motion should be denied as the instant record does not establish that plaintiff was an employee under the relevant statutory provisions, nor does plaintiff establish the actual number of hours she worked and how much she was paid for those hours.

Plaintiff has no remedy under the FLSA unless she is found to be an "employee" within the meaning of law. Even if plaintiff had established as a matter of law that she was an employee for the purposes of the FLSA, the record is replete with disputed facts and incomplete accounts as it pertains to plaintiff's wage and hour claims. HER Holding and EZJR did not keep contemporaneous wage and hour records for plaintiff, and they maintain that they were under no obligation to do so. Plt. 56.1 ¶¶ 55, 56; Def. Counter-Stmt. ¶¶ 55, 56. If it is determined that defendants are correct, then HER Holding and EZJR would have no obligation to maintain plaintiff's employment records. Plaintiff has produced copies of the till summary receipts from the Brooklyn store for certain months in 2014, that recap the revenues earned each day and the dates on which plaintiff took money directly from the till to pay for her hours. Blit Decl. Exh. 2. Plaintiff also includes time records reflecting her hours from May 13, 2014 through December 31, 2014, however, the Court does not know if the records are

contemporaneous and who created them. Id. Also included is one-page of "payroll records" pertaining to the paychecks plaintiff was issued between October and December 2014, and pictures of the same. Id.; 2d DeCristofaro Decl, ECF No. 68, Exh. O.

Even if the number of hours plaintiff actually worked were not in dispute, none of these documents compare hours worked to wages paid in a way that would allow the Court to calculate damages. The parties have not produced reliable evidence to determine plaintiff's wages or hours. Furthermore, defendants dispute that plaintiff staffed the Brooklyn store during the hours that the store was supposed to be open. They further dispute that she promoted the brand in clubs for four nights each week.[27] As the record is full of disputed facts as to the hours plaintiff worked and the wages she was paid, I respectfully recommend that plaintiff's motion for summary judgment on her wage and hour claims should be denied.

## II. Failure to Comply with the Wage Theft Prevention Act

Plaintiff seeks $5,000 in statutory damages under the Wage Theft Prevention Act. N.Y. Lab. Law § 198. Under the NYLL, "[e]very employer shall provide his or her employees, in writing […] at the time of hiring, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other allowances, if any, claimed as part of the minimum wage, including tip meal, or lodging allowances; the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article . . . ." N. Y. Lab. Law § 195(1) (McKinney). However, "it shall be an affirmative defense that (i) the employer made complete and timely payment of all wages due pursuant to this article… or (ii) the employer reasonably believed in good faith that it was not required to provide the employee with

---

[27] For the first time in their opposition to plaintiff's cross-motion for summary judgment, defendants raise the fact that plaintiff has failed to demonstrate that the moving defendants meet the $500,000 threshold contained in 29 U.S.C. § 203(s)(1)(A) required to hold them liable under the FLSA. The requirement set forth in 29 U.S.C. § 203(s)(1)(A) is an element of plaintiff's claim that she must prove; it is not jurisdictional. Thus, defendants' argument does not defeat plaintiff's cross-motion for summary judgment. Rather, it only serves to raise one more fact that is in dispute and cannot be determined on the instant record.

notice pursuant to subdivision one of section on hundred ninety-five of this article." N. Y. Lab. Law § 198 (1-b). Defendants do not dispute that they failed to provide plaintiff with notices pursuant to the Wage Theft Prevention Act. Rather, they dispute their obligation to provide the notices at all. Def. Counter-Stmt. ¶¶ 79, 80. As the instant record does not establish that plaintiff was an employee, the Court cannot award statutory damages under the NYLL. Accordingly, plaintiff's cross-motion for summary judgment on her claim for violations of the Wage Theft Prevention Act should be denied.


## CONCLUSION

I respectfully recommend that defendants' motion for summary judgment should be denied in its entirety. I further recommend that plaintiff's cross-motion for summary judgment should be granted in part and denied in part. Plaintiff's cross-motion for summary judgment should be granted on her claims that defendant HER Holding operated as a single integrated enterprise with HER Imports and that EZJR operated as a joint employer with HER Imports and HER Holding under the FLSA. The remainder of plaintiff's cross-motion should be denied.


## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42, 46 (2d Cir. 2002); Small

v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

          /S/             

LOIS BLOOM
United States Magistrate Judge

Dated: February 16, 2018
       Brooklyn, New York